## Commonwealth v. Brown

*Robert C. Houpt*, for Commonwealth.
*John J. Duffy*, for defendant.

SUGARMAN, *J.*, March 14, 1978—We are called upon to determine whether a person causing the death of a 36-week-old fetus in utero may be charged with criminal homicide under the Crimes Code of Pennsylvania ("Crimes Code").[1] The question is posed within the framework of a petition for a writ of habeas corpus, filed by defendant who is presently incarcerated in lieu of bail upon charges of the murder and manslaughter of the fetus.

The facts giving rise to the instant charges are quickly gleaned from the transcript of defendant's preliminary hearing, and for the purpose of deciding the narrow issue before us, were agreed upon by counsel for the parties.

On October 21, 1977, defendant, Stephen Craig Brown, stabbed his wife, Patricia Brown, 12 times, wounding her fatally in the neck, chest, abdomen and heart. Each of the wounds, inflicted with a

---

1. Act of December 6, 1972, P.L. 1482, sec. 1 et seq., 18 C.P.S.A. §2501.

large kitchen knife, penetrated Mrs. Brown's body to a depth of five to six inches. Mrs. Brown died within minutes of the attack.

At the time of the incident, Mrs. Brown was pregnant, carrying a viable male fetus then 36 to 38 weeks in gestation. As the result of wounds to the abdomen, liver and intestine of the fetus inflicted by defendant as he stabbed his wife in the lower abdomen, and maternal wounds, the fetus, called "Baby Boy Brown," died in the mother's uterus.

The testimony of the Commonwealth's forensic pathologist at the preliminary hearing established that had the fetus been born naturally, or delivered artifically immediately prior to the incident, it could have survived independently of its mother, absent the wounds inflicted by defendant. No air or other evidence of respiration or expansion was found in the lungs of the fetus, and when examined, the umbilical cord, although lacerated during the attack, was in place and attached.

Following the incident, defendant was arrested and charged in two criminal complaints with criminal homicide, the first charging criminal homicide of the mother, Patricia Brown, and the second, criminal homicide of the fetus, Baby Boy Brown.

Defendant, in his petition, contends that he is illegally detained upon the charge of homicide of Baby Boy Brown as, he argues, a fetus not yet born, is not a "human being" as that term is used in the Crimes Code, and cannot be the victim of a homicide. Restated, defendant argues that an act of "feticide"[2] or "infanticide"[3] or "abortional

2. 40 A.L.R. 3d 444, 447 (1971).

3. Keeler v. Superior Court, 2 Cal. 3d 619, 626, 470 P. 2d 617, 620 (1970).

homicide,"[4] as defendant's conduct is variously described, is not a criminal homicide in Pennsylvania, and he may not, therefore, be detained upon such charge.

## DISCUSSION

Defendant has been charged with criminal homicide under the Crimes Code in that he did allegedly murder or commit manslaughter upon Baby Boy Brown, a fetus 36 to 38 weeks in gestation. In order to determine whether such act is encompassed within the criminal homicide provisions of the Crimes Code, it is necessary that we interpret and construe the Crimes Code, endeavoring thereby to determine whether the legislature of Pennsylvania intended to make the killing of a viable fetus an act of murder. At the same time, we also examine other authorities on the subject.

### I
### The Crimes Code

Section 2501(a) of the Crimes Code, 18 C.P.S.A. §2501(a), defines criminal homicide in the following language: "(a) Offense defined.—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another *human being*." (Emphasis supplied.)

The Crimes Code then classifies criminal homicide into three general subclassifications:

"§2501. Criminal homicide . . . (b) Classification.—Criminal homicide shall be classified as

---

4. Id. at 625, 470 P. 2d at 620.

murder, voluntary manslaughter, or involuntary manslaughter." The subclassification "murder" is itself further divided into three degrees: murder of the first degree, murder of the second degree, and murder of the third degree. Id. §2502, 18 C.P.S.A. §2502.[5]

Murder of the first and second degrees under the Crimes Code, together, correspond to murder of the first degree as it was under The Penal Code of 1939.[6] Murder of the first degree under the Crimes Code is an intentional killing, and murder of the second degree is felony murder, both formerly encompassed in the crime of murder of the first degree under The Penal Code of 1939. Murder of the third degree under the Crimes Code, described as "all other kinds of murder," now substitutes for murder of the second degree under The Penal Code of 1939, and is described in the same language: Com. v. Polimeni, 474 Pa. 430, 378 A. 2d 1189, 1194 (1977).

Thus, the Crimes Code creates one principal homicide offense, that of criminal homicide, and the several types of homicide—murder of the three degrees, voluntary manslaugher and involuntary manslaughter—are constituent subsidiary offenses within the principal offense of criminal homicide: Com. v. Polimeni, supra, at 440, 378 A. 2d at 1194-95.

Recalling again that one must be a human being in order to be the victim of a criminal homicide under the Crimes Code, we observe that the words

5. Murder of the third degree was added to the Crimes Code by the Act of March 26, 1974, P.L. 213, sec. 4, 18 C.P.S.A §2502.

6. Act of June 24, 1939, P.L. 872, sec. 701, 18 C.P.S.A. §4701.

are not defined in section 2501, describing criminal homicide, or in section 2502, describing the degrees of murder. Neither are they defined in any other section of the Crimes Code.[7] Nor, do we note, is the word "murder" defined in the Crimes Code. We must therefore search elsewhere to find the definitions of the words and the origin of sections 2501 and 2502 of the Crimes Code.

## II
### The Law of Murder Underlying The Crimes Code

Section 2502, relating to murder of the three degrees, merely distinguishes among the degrees, but does not, as we have noted, attempt to define murder itself. As we have also observed, however, section 2502 of the Crimes Code is nearly identical to the language of The Penal Code of 1939 describing the offense of murder. Our Supreme Court has observed this similarity, as well, and has accordingly said:

"When we read Section 2502(a) and (b) [footnote omitted] together, it becomes apparent that the

---

7. The victim of an act of voluntary manslaugher is described in section 2503 of the Crimes Code, 18 C.P.S.A. §2503, as an "individual," and the victim of an act of involuntary manslaughter as described in section 2504, 18 C.P.S.A. §2504, as "another person." For the purpose of this opinion, we do not distinguish among these descriptive words, assuming as we do that the words "human being" appearing in section 2501, defining the principal offense of criminal homicide include the descriptive words appearing in the text of the subsidiary offenses. It is also assumed, logically, that one must be a human being to be the victim of *any* subsidiary offense of criminal homicide.

Legislature followed the same pattern as that used in the drafting of the previous murder section found at Section 701 of the 1939 Code . . . This virtual adoption of the former Section 701 provides the clearest possible indication of a legislative intent to incorporate [in the Crimes Code] the existing law of murder [footnote omitted] . . ." (Emphasis supplied.) Com. v. Allen, 475 Pa. 165, 379 A. 2d 1335, 1339 (197 ). Accordingly, we look to The Penal Code of 1939, and again we discover that murder is not defined.

Our Supreme Court has recognized this omission, as well, and has accordingly held on a number of occasions that the definition of murder is to be derived from the common law. ". . . However, since this statutory classification [in The Penal Code of 1939] merely categorizes murder into two degrees, *it is to the common law that one must look for the definition of murder . . ."* Com. v. Yuknavich, 448 Pa. 502, 506, 295 A. 2d 290, 292 (1972). (Emphasis supplied.)

And in Com. v. Redline, 391 Pa. 486, 137 A. 2d 472 (1958): ". . . The so-called murder statute of this State [Penal Code of 1939] is but a categorizing of common law murder into two degrees . . ." Id. at 492, 137 A. 2d at 475.

Finally, we observe that section 107(b) of the Crimes Code abolishes common law crimes in Pennsylvania and provides that no conduct constitutes a crime unless it is a crime under the Crimes Code or another statute of the Commonwealth. At the same time, in Toll, Pennsylvania Crimes Code Annotated, §107, at 28, the reporter comments pertinently: "Although the Crimes Code abolishes common law offenses, it does not abolish the com-

mon law definitions except insofar as inconsistent with the statute." Accordingly, we must look to the common law to determine whether an unborn fetus can be the subject of murder, or, stated in the context of the case at bar, whether an unborn fetus is a "human being" as those words appear in section 2501 of the Crimes Code.

## III
### Murder at Common Law

The Supreme Court of Pennsylvania has frequently said that the definition of murder at common law is not only best articulated, but was first adopted into the jurisprudence of Pennsylvania in and by Com. v. Drum, 58 Pa. 9 (1868).[8]

In Drum, murder was defined by Justice Agnew in his charge to the jury,[9] and during the course of his charge, Justice Agnew instructed the jury: " . . . At the common law murder is described to be, when a person of sound memory and discretion unlawfully kills any *reasonable creature in being* . . . " Id. at 15. (Emphasis supplied.) Referring to that

---

8. Drum still retains its vitality, as Justice Pomeroy notes in writing the opinion of the court in Com. v. Polimeni, supra: " . . . The definition of this classification of criminal homicide [murder of the third degree] under the Crimes Code, therefore, like the definition of murder in the second degree under the former Penal Code, is to be derived from the common law. See Commonwealth v. Drum, 58 Pa. 9 (1868) . . . " Id. at 439, n. 12, 378 A. 2d at 1194, n. 12.

9. Justice Agnew, a member of the Supreme Court of Pennsylvania, was assigned to preside in the court of Oyer & Terminer of Westmoreland County, upon refusal of the President Judge of the County Court who was related to defendant.

specific instruction, the court in Redline said: " . . . 'the reasonable creature in being' specified in the common law definition of murder, as stated in the Drum case, was none other than the *human being* whose death at the hands of another is still necessary to constitute a homicide . . ." supra at 493, 137 A. 2d at 475. (Emphasis supplied.)

Thus, as we observe, the words "human being" with which we are concerned at bar were equated by Redline with the words "reasonable creature in being," as the latter phrase derives from the common law. Beyond this, however, neither Drum nor Redline provide a definitive explication of either phrase. We must then endeavor to seek further guidance by examining the common law to which Drum refers.

Commenting upon the definition of murder at common law as expressed by Justice Agnew in Drum, the court in Redline said: " . . . Such is substantially the definition of murder which this court adopted in Commonwealth v. Drum . . ., and which has ever since been uniformly applied by this court in the multitude of murder trials that has followed . . . " supra at 493, 137 A. 2d at 475.

The word "such" in the quoted passage refers to Blackstone, and the suggestion has been offered that the definition of murder in Pennsylvania, adopted in Drum, is the definition as presented by Blackstone. For example, in Com. v. Ladd, 402 Pa. 164, 166 A. 2d 501 (1960), Justice Bok, considering The Penal Code of 1939, and writing the opinion of the court, said pertinently: "In Pennsylvania, we have no statutory definition [of murder] but we have taken the Blackstonian definition as our own: Commonwealth v. Redline [citation omitted], saying that it was substantially the one adopted in

Commonwealth v. Drum [citation omitted], and uniformly applied thereafter . . ." Id. at 172, 166, A. 2d at 505.

We thus turn to Blackstone and immediately discover that Blackstone does not himself define murder, but merely comments and expands upon the definition or description of the crime as given by Coke: "Murder is therefore, now thus defined or rather described by Sir Edward Coke: ' . . . when a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied' . . ." IV Blackstone's Commentories *194 (Sharswood ed. 1860, Vol. II at 461).

Called by some commentators as the most influential statement ever published on the subject, Coke in the mid-seventeenth century wrote, in describing murder and considering the words "reasonable creature in being":

"If a woman be quick with childe, and by a potion or otherwise killeth it in her wombe, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, *this is a great misprision* [misdemeanor] *and no murder;* but if the childe be born alive and dyeth of the potion, battery or other cause, this is murder; for in law it is accounted a reasonable creature in rerum natura,[10] when it is born alive." 3 Coke, Institutes 58 (1648). (Emphasis supplied.)

Commenting and expanding upon this passage of Coke, and upon the elements of Coke's general description of murder, Blackstone said: "Further, the

---

10. Literally, "in the nature of things," Black's Law Dictionary 901 (rev. 4th ed. 1968).

person killed must be *'a reasonable creature in being . . .'* To kill a child in its mother's womb is now no murder, but a great misprision: but if the child be born alive and dieth by reason of the potion or bruises it received in the womb, it seems, by the better opinion, to be murder . . . " IV Blackstone's Commentories *198 (Sharswood ed. 1860, Vol. II at 464) (emphasis in original).

Some 13 years following Blackstone, Hale in his classic Pleas of the Crown reiterated the principle:

"If a woman be quick or great with child, if she takes, or another gives her any potion to make an abortion, or if a man strike her, whereby the child within her is killed, it is not murder nor manslaughter by the law of England, because it is not yet in *rerum natura* . . . But if a man procures a woman with child to destroy her infant, when born, and the child is born, and the woman in pursuance of that pronouncement kills the infant, this is murder . . . " 1 Hale, Pleas of the Crown (1778), at 433. See also 1 Hawkins, Pleas of the Crown (1762) chi. 31, §16. (Emphasis in original.)

Against this background, a series of feticide prosecutions were brought in the English Courts in the mid-19th century, the law as pronounced by Coke, Hawkins, Blackstone and Hale was applied, and it was uniformly held that a verdict of murder could not be returned unless it was proved that the infant had been born alive: Keeler v. Superior Court, 2 Cal. 3d 619, 626, 470 P. 2d 617, 620 (1970). Many of the leading cases are collected in Keeler, supra, at 626-27, 470 P. 2d at 620-21.

It is perhaps of more than historical interest to note that the Crimes Code as adopted by the legislature of Pennsylvania in 1972 has many historical

roots in the Act of May 31, 1718, P.L. 105, 1 Sm.L. 135, adopted when Pennsylvania was yet a colonial province. The Act of 1718 was supplanted by the Act of January 28, 1777, P.L. 429, 1 Sm.L. 429, adopted following publication of the Declaration of Independence, which incorporated all the laws in force prior to the date of the act, excepting those relating to allegience to the King, treason and similar subjects, and specifically incorporated the common law of England into Pennsylvania law:

". . . [E]ach and every one of the laws or acts of the General Assembly, that were in force and binding on the inhabitants of the said province on the fourteenth day of May last, shall be in force and binding on the inhabitants of this state from and after the tenth day of February next . . . and the common law and such of the statute-laws of England, as have heretofore been in force in the said province, except as hereafter excepted." Act of January 28, 1777, sec. II, 1 Sm. L. 429.

There followed in Pennsylvania the Act of April 22, 1794, P.L. 186, 3 Sm.L. 186, readopting the common law description of murder, but for the first time, classifying murder into two degrees.[11] The next major revision of the statutes proscribing

---

11. Murder at common law was not subdivided or clasified into degrees. Such classification first appeared in the Act of April 22, 1794, P.L. 186, sec. 2: " . . . That all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree . . . " When

criminal conduct in Pennsylvania occurred in 1860 with the adoption of The Penal Code of March 31, 1860, P.L. 382, again incorporating the Coke-Blackstone definition or description, as modified only by the Act of 1794, dividing murder into two degrees. Sections 74-76 of the Act of 1860 set forth the common law description of murder. In 1939, the legislature adopted The Penal Code of that year, effectively amending some sections of the Act of 1860, and repealing most. Section 701 of The Penal Code of 1939, 18 P.S. §4701, relating to murder of the first and second degrees, is a consolidation of sections 74-76 of the Act of 1860, and tracks the language of the latter act nearly identically in its description of murder.[12] Finally, as we have observed, the Crimes Code adopts section 701 of The Penal Code of 1939, and incorporates the law of murder as it then existed: Com. v. Allen, supra.

It is thus apparent to us that section 2701 of the Crimes Code, and sections 2702-4 describing the subsidiary offenses of murder and manslaughter, are nothing more or less than the embodiment of the common law definition of murder as pronounced by Coke, expanded upon by Blackstone and Hawkins, and introduced into Pennsylvania by

---

we recall that the penalty for all murder was at that time death, the preamble to the cited section of the Act of 1794 succinctly sets forth the intent of the legislature in dividing murder into two degrees: "And whereas the several offences, which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment . . ."

Section 1 of the Act of 1794 provided that no crime, except murder of the first degree, was to be punished by death.

12. See Historical Note, 18 P.S. §4701, at 14.

the Act of 1777. Under that law, as we have seen, the killing of a fetus was regarded as murder only if the fetus was born alive, lived for an interval, no matter how brief, and then died as the result of injuries inflicted before or during birth.[13] See Keeler v. Superior Court, 2 Cal. 3d at 626, 470 P. 2d at 620.

We must therefore conclude that the legislature in declaring the act of killing a "human being" to be criminal homicide, intended that term to have the settled common law meaning of a person who had been born alive as those words are commonly understood, and did not intend the act of feticide, as distinguished from abortion, to be murder or manslaughter in Pennsylvania.

## IV
### The Cases in Pennsylvania

It is perhaps for the reason that the law on the subject in Pennsylvania has been so well settled that we find no appellate cases dealing with the murder or manslaughter of an unborn fetus, although our printed reports date from at least the year 1759.[14] Lacking appellate guidance, we have

---

13. Compare People v. Chavez, 77 Cal. App. 2d 621, 176 P. 2d 92 (1947), holding that a viable child, *in the process of being born*, is a human being within the meaning of the California homicide statute. The holding in Chavez is properly limited by the comments thereon in Keeler, supra, 2 Cal. 3d at 636-38, 470 P. 2d at 628-630.

14. See Hyam v. Edwards, 1 Dallas 1 (1759). (Reports on Cases Ruled and Adjudged in the Courts of Pennsylvania before and since the Revolution, 1790, 2d ed. 1806.)

examined three reported decisions of the courts of Philadelphia, Montgomery and Allegheny Counties.

In the first of these, Pennsylvania v. McKee, 1 Addison 1 (1791), and arising in Allegheny County, defendant Susanna McKee was tried upon a charge of murdering her bastard child. The child was found dead in the Monongahela River, bruised, with a stone tied to its head. Defendant admitted the child was hers but defended upon the ground that it had been born dead.

The charge against defendant mother was based upon a section of the Act of 1718, 1 Sm.L. 135, adopted by the Act of 1777, declaring it to be a crime punishable by death, as murder, for any woman to conceal the death of a bastard child. The act further provided that concealing the death of such child was a crime, "whether it were born alive or not," *unless the mother was able to prove by one witness that the child was born dead.* The statute thus made the act of concealment of the death of the child evidence that the child had been born alive and then killed by its mother.

The court's charge to the jury is set out in the report, and in its charge the court speaking to the question of the presumptions, said:

"This law is borrowed from England; and there, as it savoured of severity, it became usual, in trials for this offense, to require some sort of presumptive evidence, *that the child was born alive* [before the mother could be convicted of the crime] . . . *And this practice of the English courts was expressly established as the law of Pennsylvania by* . . . [the Acts of 1786 and 1790] *which declared that this*

*concealment shall not be sufficient evidence, to convict the mother, without probable, presumptive proof that the child was born alive.*

*"To support this indictment, therefore, there must be first, positive evidence of the concealment, then probably evidence of the birth alive."* Id. at 2. (Emphasis supplied.)

The court then instructed the jury upon examples of presumptive evidence of a live birth:

"Presumptive evidence of the birth alive is sufficient. Want of hair, nails, &c. or other circumstances of a premature birth, must be evidence in favour of [the defendant]. Circumstances of maturity, marks of violence, &c. are evidence against her . . . The presumption ought to be such, as . . . will induce you to believe, that the child was born alive, and killed, by . . . the mother." Id. at 2, 3. Susanna McKee under those instructions was found not guilty.

In a note following the charge of the court, the Commentator, Addison, examines the English Statutes upon which the Act of 1718 was based, and then observes: "The same form was adopted in Pennsylvania, as a specific indictment for the same offence, under our act of 1718; and continued to be so under our act of 1786 and of 1790, which, besides concealment of death, *required additional presumptive evidence of birth alive."* Id. at 3-4. (Emphasis supplied.)

The Act of 1794, which, as noted, divided the crime of murder into two degrees, also radically altered the punishment for the crime of concealing the death of a bastard child, formerly punished as murder. The act reduced the punishment from

death to imprisonment for not more than five years, and further provided that proof of concealment of death and proof of a live birth together were insufficient to convict of murder "unless there be circumstances of wilful murder." Id. at 4. Notwithstanding the commentator's observations to the contrary, it appears that the Act of 1794 makes the act of concealing the death of a bastard child a specific offense, rather than a component of murder as under the earlier acts.[15]

As we have seen, sections 74-76 of The Penal Code of 1860 adopted virtually verbatim the provisions of the Act of 1794 relating to the crime of murder, and it was under The Penal Code of 1860 that Ms. O'Donohue was charged in Philadelphia County with the murder of her new born child. The en banc decision in her case, reported at Com. v. O'Donohue, 8 Phila. 623 (1871) (Leg. Int. 1871, at

---

15. It is interesting to note that the offense of concealing the death of a bastard child, derived from an English Statute of the 17th century, has survived to this day in Pennsylvania, in nearly identical language. Section 303 of the Crimes Code, 18 C.P.S.A. §4303 defines the offense of concealing the death of a bastard child in the following language: "A person is guilty of a misdemeanor of the third degree if she, being a woman, endeavors privately, either by herself or the procurement of others, to conceal the death of her bastard child, so that it may not come to light, whether it was born dead or alive or whether it was murdered or not." As noted by the joint State Government Commission, this section of the code retains the law on the subject as contained in section 720 of The Penal Code of 1939, 18 P.S. §4720, without substantial change and in nearly identical language. Toll, Pennsylvania Crimes Code Annotated, §4303, 509. The Penal Code of 1939, in turn, essentially adopts the language of the Act of 1794.

350), a model of brevity, is reproduced here in its entirety:

"Defendant was charged with the murder of her new born child. The evidence submitted by the commonwealth showed that the child was dead when first seen by the witnesses, shortly after delivery, and no witnesses had seen it in the absence of the mother or heard it cry. The mother was delivered in an out-house, and said it was born dead. The post mortem examination showed that the child was of full term and perfectly healthy; the hydrostatic tests proved that the lungs had been fully inflated, and consequently it had made at least one full respiration, and that death was caused by suffocation. The medical witnesses, who made the post mortem examination, said that the inflation of the lungs was evidence that it had a medical existence, that is, had breathed during or after birth, but they could not say it had been born into the world alive, or in other words, had a legal existence.

"The court held that this case was ruled by the law as pronounced in Commonwealth vs. Hester Vaughn, that it was necessary for the commonwealth to prove affirmatively not only that the child had breathed, because that might occur during birth, but that it had had a complete and separate existence of its own after birth.

"Verdict not guilty."

As is readily apparent from O'Donohue, before a child could be the victim of a homicide under The Penal Code of 1860, the Commonwealth was required to prove that the child was not only born alive, but that it had a complete and separate existence, apart from its mother.

The third of the three reported decisions in Pennsylvania, touching upon the matter at hand, and the most recent, is Com. v. Riley, 88 D. & C. 572, 69 Montg. 306 (1953). The Penal Code of 1860, under which Ms. O'Donohue was tried, was supplanted by The Penal Code of 1939, and it was under the latter act that Bernice Riley was charged in Montgomery County with concealing the death of a bastard child.

Finding that the child—more precisely, "fetus," id. at 575—had been born dead and was incapable of external existence the court declared defendant not guilty. In reaching its conclusion, the court traced the law relating to the crime of concealment of a bastard child, and found it had evolved from a statute of King James, 21 Ja. 1, c. 27, was first introduced in Pennsylvania by the Act of 1718, and was carried forward by the Act of 1777. The court also noted that the Acts of 1786 and 1790 amended the Act of 1718 so that concealment of the death of the child was *not* sufficient evidence to convict the mother without probable presumptive proof that the child was born alive. See Pennsylvania v. McKee, supra, at 2-3.

The court correctly noted that the purpose of the statute declaring the act of concealing the death of a bastard child was not to prevent concealment of the birth of the child, but was rather, to prevent concealment of the death of a bastard child "in order that it may be ascertained whether it was born dead or whether it was murdered." Id. at 575.

The court then observes: "This gives rise to the interesting questions of whether the fetus was 'born', whether it was a 'child' and whether it could be 'murdered.' " Id. at 575. The court, citing a leading author, next observes: "In Wharton's Criminal

Law, vol. I, page 796, under the subject of Infanticide, the author states that: 'To kill a child in its mother's womb is no murder.' The evidence is that this fetus was born dead, *hence if it was killed at all, it must have been killed in its mother's womb and therefore it could not be murdered . . .*" Id. at 575. (Emphasis supplied.)

As the court based its finding upon the failure of the Commonwealth to prove that defendant concealed the death of the fetus, the principal element of the offense, much of the court's commentary upon the requirement of a live birth is properly labeled as dictum. Those comments, however, are in accord with the common law, and more pertinently, are the most recently reported judicial pronoucements on the question in the Commonwealth.

We thus find the only reported decisions in Pennsylvania, spanning a period of 162 years and concerned with interpretations of the Acts of 1718, 1777, 1790, 1860 and 1939, are in complete accord with the common law as enunciated by Coke, Blackstone and Hawkins.

The conclusion one must inevitably draw is apparent: All the common law scholars and commentators, beginning with Coke, and all the authors of the texts and treatises generally in use in Pennsylvania, as well as the three reported decisions on the subject, agree that a fetus in utero, as Baby Boy Brown, cannot be the subject of criminal homicide unless first born alive and existing independently of its mother.

While we should ordinarily find this body of law dispositive on the question, the significance of the subject causes us to seek further illumination in the appellate decisions of our sister jurisdictions.

# V
## The Cases in Other Jurisdictions

An examination of the appellate decisions of other states touching upon the subject reveals at once that in no jurisdiction in the United States has the killing of an unborn fetus been held to constitute murder or manslaughter in the absence of a statute declaring the contrary. See, for example: Clarke v. State, 117 Ala. 1, 23 So. 671 (1898); Passley v. State, 194 Ga. 327, 21 S.E. 2d 230 (1942); Shedd v. State, 178 Ga. 653,173 S.E. 847 (1934); State v. Winthrop, 43 Iowa 519 (1876); Abrams v. Foshee, 3 Iowa 274 (1856); Morgan v. State, 148 Tenn. 417, 256 S.W. 433 (1923); State v. Cooper, 22 N.J.L. 52 (1849); Evans v. People, 49 N.Y. 86 (1872); State v. Dickinson, 28 Ohio St. 2d 65, 275 N.E. 2d 599 (1971); Jackson v. Com., 265 Ky. 295, 96 S.W. 2d 1014 (1936); Keeler v. Superior Court, supra; and State v. Gyles, 313 So. 2d 799 (1975). See also, 40 A.L.R. 3d 444 (1971), and the cases therein collected. In each of these decisions, representing the views of the highest appellate courts of at least 20 jurisdictions, the common law as espoused by Coke, Blackstone, Hawkins and Hale was adopted or reiterated and applied to a factual setting similar to that at bar.

While the cited decisions reinforce our conviction that at common law, a fetus in utero cannot be the victim of murder, that conviction becomes a practical certainty in light of the language of the most definitive of all the decisions upon the subject: Keeler v. Superior Court of Amador County, supra, a case so closely paralleling the operative facts at bar as to be virtually indistinguishable from it.

The opinion of the California Supreme Court in Keeler, written by Justice Mosk and concurred in by four of the seven justices of the court, traces the law on the subject, from Coke, Blackstone, Hale, Hawkins and Bracton, through the English cases, and the early American decisions, to the present state of the law. The opinion can easily serve as a treatise on the subject without resort to other works and as we find Keeler dispositive of the case at bar, we recite its factual underpinnings in moderate detail.

Defendant, Robert Keeler, and Teresa Keeler were formerly married, having obtained an interlocutory decree of divorce. At the time the divorce was obtained, and then unknown to defendant, Mrs. Keeler was pregnant by one Vogt, with whom she lived. At some time between the date of the decree and February 23, 1969, defendant learned of Mrs. Keeler's pregnancy. On the latter date, defendant while driving on a narrow road, observed Mrs. Keeler driving in the opposite direction. He thereupon blocked the road with his car, forcing Mrs. Keeler to stop. Defendant then walked to Mrs. Keeler's vehicle and said to her "I hear you're pregnant. If you are you had better stay away from the girls [the parties' children, then in defendant's custody] . . . " Mrs. Keeler made no reply, whereupon defendant opened her door and assisted her out of her car. Defendant then looked at her abdomen, became upset and said "You sure are. I'm going to stomp it out of you." So saying, defendant pushed Mrs. Keeler against her car, struck her about the head and shoved his knee into her abdomen.

Mrs. Keeler was hospitalized as a result of defendant's conduct, suffering extensive bruising of

her abdominal wall. A caeserian section was performed and the fetus was examined in utero. Its head was found to be severely fractured, and it was delivered stillborn. Defendant was charged with murder of the fetus under the California Penal Code.

At defendant's preliminary hearing, the prosecution's pathologist testified that in his opinion the cause of death was skull fracture with consequent cerebral hemorrhaging, that death was immediate, and that the injury to the fetus could have been the result of the application of defendant's knee to the mother's abdomen. There was no air in the lungs of the fetus and the umbilical cord was intact.

The pathologist further testified that the fetus was between 34 and one-half and 36 weeks in age,[16] that the fetus was viable at the time defendant acted, and in the event of a premature birth at that time, the fetus would have had a 75 to 95 percent chance of survival.

The section of The Penal Code under which the defendant was charged provided: "Murder is the unlawful killing of a human being with malice aforethought." As the Keeler court then notes, the dispositive question in the case was whether the fetus, then 34 and one-half to 36 weeks of age, was a "human being" within the meaning of The Penal Code in California.

The court in its opinion sets out in detail the common law of murder, citing Coke, Blackstone, Hale, Hawkins and Bracton, and many of the cases, both English and American, adopting the views of

16. The court notes that the average full-term pregnancy is 40 weeks: Keeler v. Superior Court, 2 Cal. 3d at 624, n. 1, 470 P. 2d at 619, n. 1.

those commentators on murder as the common law on the subject in the United States in the year 1850, the date The Penal Code of California was enacted.

The court ultimately held that an unborn fetus was *not* a human being within the context of The Penal Code, and thus, could not be the victim of an act of murder, saying as it did:

"We conclude that in declaring murder to be the unlawful and malicious killing of a 'human being' the legislature of 1850 intended that term to have the settled common law meaning of a person who had been born alive, and did not intend the act of feticide—as distinguished from abortion—to be an offense under the laws of California." Id. at 628, 470 P. 2d at 622.

The Keeler court also cogently stated that to hold otherwise would result in the court judicially creating a crime where none before existed, an act wholly inappropriate to the judicial function, and a gross invasion of the legislative prerogative. Of equal significance, the court held that such "judicial legislation" would deny defendant due process, as he did not have fair warning of the act made punishable as a crime, and further, application of a contrary holding to defendant would operate ex post facto, in further violation of the Constitution of the United States.[17] Id. at 633-34, 470 P. 2d at 626-27.[18]

---

17. United States Constitution, Art. I, §§9, 10. See Pennsylvania Constitution, Art. 1, §17 for the parallel provision in force in the Commonwealth.

18. It is instructive to note that following the court's decision in Keeler, the legislature of California amended The Penal Code so as to expressly include the death of a fetus, under

We find both the rationale of Keeler and its holding to be apposite and compelling here, and the opinion itself an accurate summary of the present state of the law in Pennsylvania.

The Keeler opinion also reviews several cases from jurisdictions other than California, two of which are of particular interest to us. In Abrams v. Foshee, supra, defendant was charged with the murder of an unborn child under a section of the Iowa Code providing that whoever kills any *human being* with malice aforethought is guilty of murder. Dismissing the charge of murder, the Iowa Supreme Court observed that:

". . . notwithstanding the infant in *ventre sa mere*, is treated by the law for some purposes, as born, or as a human being, yet we are not aware, that it has been so treated, so far as to make the act of causing its miscarriage *murder* [emphasis in original] unless so declared by statute . . . When the child is born, however, it becomes a human being, within the meaning of the law . . ." Id. at 278. (Emphasis supplied.)

Citing Coke and Blackstone, the court concluded that "an infant in *ventre sa mere*," is not a human being within the meaning of the Iowa statute defining murder: Id. at 278. And see Keeler, supra, 2 Cal. 3d at 629, 470 P. 2d at 622.

---

specified conditions, within the crime punishable as murder: 48 West's Annot. Calif. Codes §187 (as amended by Stats. 1970 c. 1311 p. 2440). See State v. Gyles, supra, at 801, n. 6, and defendant's brief at 12. Examples of similar statutes are found in Mississippi, at 20 Mississippi Code 1972 Annot., Title 97-3-37, and 24 A. Michigan Statutes Annot., §28.555, 39 M.C.L.A. 750.323 (1972).

In State v. Gyles, supra, a case decided as recently as 1975, defendant struck a woman in the eighth month of pregnancy, causing her male fetus to be stillborn. Defendant was charged with the murder of the stillborn fetus under a section of the Criminal Code of Louisiana, defining murder as ". . . the killing of a *human being*: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm . . . " (Emphasis supplied.)

Finding the definition of murder in the Criminal Code to be merely a codification of the common law, the Louisiana Supreme Court said pertinently:

"The common law crime of murder, which proscribes the killing of a 'human being,' contemplates only the killing of those human beings who have been born alive and who thus have an existence independent of their mothers at the time of their death. The crime does not punish conduct which causes the death of a fetus not born alive due to an assault on the mother, in the absence of a statute expressly changing the common law definition of the crime. *The uniform authority in all American jurisdictions is to this effect.*" (Emphasis supplied.)

The two latter cases are merely representative of the decisions of more than 20 American jurisdictions, as noted, collected in the authorities cited here and uniformly holding that the crime of murder is not committed by an act which causes the death of a fetus not born alive, in the absence of a statute expressly altering the common law definition or description of murder. There are no decisions to the contrary. The weight of such authority is clearly overwhelming.

## VI
## Other Authorities

Our research has also led us to the treatises and encyclopedae, and all uniformly agree that in the absence of a contrary statute, the killing of an unborn fetus is not murder. The following quotation with footnotes omitted is both illustrative and typical:

"An infant may be the subject of homicide, but at common law, and except as the statutes may otherwise provide, it is necessary that the child be fully born, and have an existence independent of its mother, and derive none of its power of living through any connection with her . . ."

"Ordinarily, a child becomes fully born so as to be a subject of homicide when the body of the child has been completely delivered and an independent circulation established. According to some authorities the umbilical cord must have been severed, but according to others this is not necessary.[19] If the child is born alive it may be the subject of homicide although its death was caused by injuries inflicted before its birth." 40 C.J.S., Homicide, §2.b., p. 825.

To precisely the same effect are 40 Am. Jur. 2d 300, §9, at 300.01; 1 Wharton's Criminal Law and Procedure, §189, at 433-35 (Anderson ed. 1957); W. LaFave and A. Scott, Handbook on Criminal Law, §67, at 530-32 (1972); and W. Clark and W. Marshall, A Treatise on the Law of Crimes, §10.00

---

19. Compare People v. Chavez, 77 Cal. App. 2d 621, 176 P. 2d 92 (1947), holding that a child "in the process of being born" prematurely, had been killed when it was dropped from the mother's womb into a toilet bowl. See the limitation on this holding as set forth in Keeler, supra at 637-38, 470 P. 2d at 629.

(6th ed. 1958). State v. Gyles, supra, at 801, and the Index to Legal Periodicals, under the general heading "Homicide," collect the notes and articles appearing in the legal periodicals on the subject, again all to the same effect. The Commonwealth can find no solace in the treatises, encyclopedae or periodicals.

## VII
### The Commonwealth's Arguments

The Commonwealth in its brief advances three principal contentions in support of its position that the killing of an unborn fetus is criminal homicide under the Crimes Code of Pennsylvania.

It first argues that since the date of the decision of the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973), dealing with an abortion statute of the state of Texas, there is a recognized state interest in protecting "fetal human life," at least in the third trimester of gestation. It next argues that the presently advanced state of medical science, including new techniques routinely applied in preserving life in the prematurely born, requires that the court consider a fetus of the age of Baby Boy Brown as a human being. The Commonwealth finally argues that a fetus has been recognized in the law for some purposes as having certain rights and the court should thus consider the fetus here in the same light when we construe the Crimes Code. We treat the agruments briefly.

### (1) Abortion Statutes and Roe v. Wade

In 1973, the Supreme Court of the United States, in Roe v. Wade, supra, struck down an anti-abortion

statute of Texas that prohibited abortion regardless of when during the period of gestation it occurred. The court carefully delineated the permissible areas of regulation a state might adopt. Mr. Justice Blackmun, expressing the views of seven members of the court in an opinion that yet engenders controversy, held (1) the right to privacy, guaranteed by the Fourteenth Amendment, encompasses a woman's decision whether or not to terminate her pregnancy; (2) that right, however, is not absolute; and may to some extent be limited by the state's legitimate interests in safeguarding the mother's health, in maintaining proper medical standards, and in protecting potential life; (3) prior to the end of the first trimester of pregnancy, the state may not regulate or interfere with an attending physician's decision, reached in consultation with his patient that the patient's pregnancy should be terminated; (4) from and after the end of the first trimester, and until the point in time when the fetus becomes viable, generally agreed to occur at the beginning of the seventh month or third trimester of pregnancy, the state may regulate the abortion procedure only to the extent that such regulation relates to the preservation and protection of *maternal* health; and (5) from and after the point in time when the fetus becomes viable, the state may prohibit abortions altogether, except those necessary to preserve the life or health of the mother.[20]

---

20. It should also be noted that the court held the word "person" as used in the Fourteenth Amendment, does not include the unborn: Id. at 158, 93 S.Ct. at 729, 35 L.Ed. 2d at 180. The court at the same time said: "In areas other than criminal abortion, the law has been reluctant to endorse any theory that

The Commonwealth correctly notes that the court in addition to recognizing the important and legitimate state interest in protecting and preserving the health of the pregnant woman, also identified a similar state interest in "potential life." Addressing this interest, Justice Blackmun said:

"With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. *State regulation protective of fetal life after viability thus has both logical and biological justifications*. If the State is interested in protecting fetal life after viability, it may go so far as to prosecute abortion during that period, except when it is necessary to preserve the life or health of the mother." Id. at 163-4, 93 S.Ct. at 732, 35 L.Ed. 2d at 183. (Emphasis supplied.)

We of course agree that state regulation protective of fetal life is justified, as the Commonwealth suggests, and the legislature of Pennsylvania recognized that interest more than a century ago when it adopted The Penal Code of 1860, including therein sections prohibiting abortion, and punishing as a felony the act of causing the death of the mother in the course of performing an abortion: Act of March 31, 1860, P.L. 382, secs. 87, 88. The legislature when it adopted The Penal Code of 1939, included these two sections of The Penal Code of

---

life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth . . . " Id. at 161, 93 S.Ct. at 731, 35 L.Ed. 2d at 182.

1860 without substantial change in the language of either: Act of June 24, 1939, P.L. 872, secs. 718, 719, 18 P.S. §§4718, 4719.

Thus, at the same time the legislature proscribed murder in The Penal Code of 1939, punishable by death or life in prison, it also proscribed abortion in the same code, punishing the crime as a felony by a term of imprisonment not exceeding five years. To suggest, then, that the legislature of Pennsylvania was unaware of the state interest in protecting the unborn until the date of Roe v. Wade, in 1973, is simply not in accord with the facts of legislative history.

The Crimes Code of Pennsylvania adopted December 6, 1972 and supplanting The Penal Code of 1939, expressly saved from repeal sections 718 and 719 of The Penal Code of 1939, dealing with abortion: Act of December 6, 1972, P.L. 1482, sec. 5. Accordingly, after the adoption of the Crimes Code, Pennsylvania still punished abortion as provided in sections 718 and 719 of The Penal Code of 1939.

That situation pertained until the decision of the Supreme Court of Pennsylvania in Com. v. Page, decided on March 29, 1973, some two months following Roe v. Wade, and reported at 451 Pa. 331, 303 A. 2d 215 (1973).

Reacting to both Roe v. Wade, and Com. v. Page, the legislature continued to display an interest in the preservation of both fetal and maternal life, and as an expression of that interest, on September 10, 1974, adopted the Abortion Control Act of September 10, 1974, P.L. 639, sec. 1 et seq., 35 P.S. §§6601-6608.

Although, as is obvious from a reading of the Abortion Control Act, the legislature endeavored to remain within the perimeters of Roe v. Wade,

nevertheless, within fourteen months following adoption of the Act, most of its provisions were found to be unconstitutional and unenforcible by two three-judge United States District Courts, for the Middle and Eastern Districts of Pennsylvania, in Doe v. Zimmerman, 405 F. Supp. 534 (M.D. Pa. 1975) and Planned Parenthood Association v. Fitzpatrick, 401 F. Supp. 554 (E.D. Pa. 1975).

Two points thus emerge with clarity and bear directly upon the Commonwealth's first argument: (1) for at least 128 years, Pennsylvania has proscribed abortion as a lesser grade of felony, or a misdemeanor, in the same penal codes that have punished murder as a capital crime and manslaughter as a serious felony; and (2) the legislature, when it adopted the 1974 amendments to section 2501 of the Crimes Code, classifying murder into three degrees, was well aware of Com. v. Page, and Roe v. Wade so frequently cited in Page.

Perhaps the most telling blow to the Commonwealth's first argument, however, is delivered by section 4 of the Abortion Control Act, 35 P.S. §6604, still apparently the law in the Commonwealth, and providing in its entirety: "Whoever, with intent to do so, shall intentionally and wilfully take the life of a premature infant aborted *alive*, shall be guilty of murder of the second degree." (Emphasis supplied.)

This section of the act, it will be recalled, was adopted by our legislature subsequent to Roe v. Wade and Com. v. Page, and following the adoption of the amendment to section 2502 of the Crimes Code, the very section as so amended under which defendant at bar was charged.

The words "abort" and "premature" are not defined in the Abortion Control Act, and when such is

the case, we must construe them according to their common and approved usage: Statutory Construction Act of November 25, 1972, 1 Pa.C.S.A. §1903(a). Turning to Webster's Third New International Dictionary (Unabridged—1976), we observe that the word "abort" is defined as "to bring forth premature offspring . . . " (p. 5), and the word "premature" is defined as " . . . happening or occurring before the usual time . . . " (p. 1789).

It is apparent to us, then, that as recently as September 10, 1974, the date of the adoption of the Abortion Control Act, the legislature of Pennsylvania considered the act of killing an unborn child as Baby Boy Brown, to be punishable under the Abortion Control Act, as a misdemeanor, and reserved the charge of murder of the second degree[21] for the act of intentionally and wilfully killing a premature infant, born or brought forth alive. No matter how we might distort the plain statutory language, Baby Boy Brown was in no sense a "premature infant aborted alive," but was rather a viable, unborn

---

21. It is of some intellectual interest to observe that section 4 of the Abortion Control Act, 35 P.S. §6604, classifying the intentional killing of a premature infant aborted alive as murder of the second degree, was adopted six months subsequent to the adoption of the amendment to section 2502 of the Crimes Code, whereby felony murder was classified as murder of the second degree. It must therefore be assumed that insofar as section 4 of the Abortion Control Act it is yet constitutional, the act proscribed thereby is a felony murder, 18 C.P.S.A. §2502(b), punishable by life in prison: 18 C.P.S.A. §1102(b). A *like* act, committed upon a living infant of full term, would constitute murder of the first degree: 18 C.P.S.A. §2502(a) punishable by death or life in prison: 18 C.P.S.A. §1102(a). The distinction escapes us.

fetus, encompassed by the proscriptions of the Abortion Control Act.

(2) Advanced State of Medical Science

The Commonwealth next urges that the advanced state of the art or science of medicine should cause us to expand the scope of the phrase "human being" beyond that as limited by the common law, so as to include within its sweep, a viable, unborn fetus, capable of sustaining life independent of the organism of the mother. It is admitted that Baby Boy Brown was such a fetus. In support of its argument, the Commonwealth cites the dissenting opinion of Justice Burke, in Keeler v. Superior Court, 2 Cal. 3d at 639-46, 470 P. 2d at 630-634.

The identical argument was advanced to the court in Keeler, and summarily rejected by the majority. We find the bases for rejecting the argument as set forth in Keeler, id. at 631-39, 470 P. 2d at 624-630, persuasive and adopt them here, without restatement.

We are also ever mindful that we are construing a statute, the Crimes Code of Pennsylvania. Section 107(b) of that statute, 18 C.P.S.A. § 107(b), provides that: "(b). . . No conduct constitutes a crime unless it is a crime under this title or another statute of this Commonwealth." As is thus apparent, no conduct is now considered a crime in Pennsylvania unless it is proscribed by the Crimes Code or another statute. Common law crimes are abolished as the subtitle of section 107(b) reveals and as we have earlier noted. We have also observed that the common law definition of murder, incorporated in section 2502 of the Crimes Code, does not consider an unborn fetus to be capable of becoming the victim of a homicide. In

order for us to adopt the Commonwealth's argument, we should be thus creating a criminal offense where none before existed, and we would be in the position of rewriting the Crimes Code under the guise of construing it. This we may not do as the people have wisely entrusted that function to the legislature of Pennsylvania, and not the Courts: Halko v. Foster Township School District, 374 Pa. 269, 97 A. 2d 793 (1953). Our task is properly limited to construing the law—not *making* it. The Commonwealth's argument should be addressed to the legislature and not to this court.[22]

### (3) Other Rights Accorded An Unborn Child

Finally, the Commonwealth suggests that as an unborn child is endowed with certain limited rights under Pennsylvania law, also accorded to others, this court may and should hold that such child is therefore a human being within the purview of the Crimes Code. As authority for its factual statement, the Commonwealth cites Sinkler v. Kneale, 401 Pa. 267, 164 A. 2d 93 (1960), in which the Supreme

---

22. We would be less than candid if we were to suggest that we are unaware of or insensitive to the divergent views on the question of when life begins, tangentially raised in the case before us. See Roe v. Wade, 410 U.S. at 159-60, 93 S.Ct. at 729-30, 35 L.Ed. 2d at 180-81, and Keeler v. Superior Court, 2 Cal. 3d at 632-33, 470 P. 2d at 625-26. Those matters are, however, concerns of public policy and must be resolved by the legislature and not the courts. We accordingly express no views on the question of whether criminal liability should be extended under section 2502 of the Crimes Code to include the slaying of an unborn fetus, or the quesion of when life begins. Neither determination is necessary to the resolution of the narrow question before us.

Court of Pennsylvania reversing prior precedent, held that a child, *born alive*, may recover for injuries sustained pre-natally, regardless of whether the child was viable when the injuries were received. It is also true that in Pennsylvania, an unborn child is recognized as acquiring rights or interests by way of inheritance or other devolution of property and may also have a guardian appointed for it in the course of litigation.

Contrary to the Commonwealth's assertion, however, recognition and protection of the *property* interests of an unborn child do not date from Sinkler v. Kneale. Rather, such recognition dates from a much earlier time. As Keeler succinctly points out:

" . . . in Blackstone's day it was already well settled that 'An infant in *ventre sa mere*, or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born.' (1 Blackstone Commentaries *130 (1765)" 2 Cal. 3d at 638-39, 470 P. 2d at 629-630. (Emphasis in original.)

Inasmuch as this rule coexisted for centuries with the common law requirement of a live birth to support a conviction of homicide, and were both alluded to by Blackstone at the same time in the very same treatise, we cannot accept the argument that Sinkler v. Kneale has in the slightest degree altered the common law concept of the words "human being" as used in the context of criminal homicide. See Keeler v. Superior Court, 2 Cal. 3d at 639, 470 P. 2d at 630.

In short, we reject the Commonwealth's argument as unsupported in the law of Pennsylvania, and we must decline the Commonwealth's invitation to extend the scope of the Crimes Code, as such action on our part would seriously infringe on the constitutionally delineated province of the legislature of Pennsylvania.

## VIII
### Summary

We have determined that the common law concept of homicide as enunciated by Coke and Blackstone is embodied in the Crimes Code of Pennsylvania; and before a child may be the victim of a homicide in this Commonwealth, it must first be born alive and have an existence independent of the organism of its mother. Were we to extend the sweep of the Crimes Code to include the slaying of an unborn fetus as a criminal homicide, we would thereby improperly and unconstitutionally usurp the function of the legislature. Finally, as Baby Boy Brown was not, at the time defendant struck the mortal blows, born alive and existing independently of its mother, the death of Baby Boy Brown cannot be criminal homicide. Accordingly, the writ must issue.

## ORDER

And now, March 14, 1978, the rule heretofore granted upon the District Attorney of Chester County on December 14, 1977, to show cause why a

writ of habeas corpus should not issue in the captioned cause is hereby made absolute; the writ is hereby issued; the charges in the information at 1874-77 are hereby dismissed; and the information at 1874-77 is hereby quashed.