766 A.2d 843

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jeffrey Robert BOOTH, Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 4, 2000.

Decided Feb. 20, 2001.

Patrick J. Thomassey, Esq., Monroeville, Michael O. Bodinsky, Esq., Pittsburgh, for J. Booth.

Wayne B. Gongaware, Esq., Greensburg, Leo J. Ciaramitaro, Esq., Murrysville, for Com.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

The issue presented is whether the Commonwealth may rely upon the death of an unborn child as the predicate for the crime of homicide by vehicle while driving under the influence.

On June 29, 1997, a car driven by Appellant, Jeffrey Robert Booth, went through a stop sign and collided with a car being driven by Nancy Boehm. Both Mrs. Boehm, who was approx-

imately 32 weeks pregnant, and her husband, a passenger in the car, were seriously injured, and their unborn child died in the womb as a result of the blunt force trauma sustained by Mrs. Boehm. Appellant's blood alcohol content was subsequently determined to be 0.12%. The Commonwealth charged Appellant with, *inter alia*, one count of homicide by vehicle, 75 Pa.C.S. § 3732, and one count of homicide by vehicle while driving under the influence ("homicide by vehicle/DUI"), 75 Pa.C.S. § 3735.[1]

In an omnibus pre-trial motion, Appellant asked the trial court to dismiss the charges of homicide by vehicle and homicide by vehicle/DUI on the ground that a fetus could not be the victim of such charges, as the law does not recognize a fetus as a person. The trial court agreed and dismissed the charges, citing as controlling precedent an earlier opinion from the same judicial district, *Commonwealth v. Kemp*, 75 Westmoreland L.J. 5 (1992), *aff'd*, 434 Pa.Super. 719, 643 A.2d 705 (1994) (table). In *Kemp*, charges had been filed against a pregnant woman on the basis of her purported "delivery" of cocaine, through her own use, to her unborn child. The trial court dismissed the charges, emphasizing the requirement that penal statutes be strictly construed. *See* 1 Pa.C.S. § 1928(b)(1).

The Commonwealth appealed the dismissal of the homicide by vehicle/DUI count to the Superior Court, and a divided panel reversed. *See Commonwealth v. Booth*, 729 A.2d 1187 (Pa.Super.1999).[2] The critical issue, as the Superior Court majority recognized, centered on the definition of the term "person" in Section 3735(a) of the Vehicle Code, which defines the offense of homicide by vehicle/DUI as follows:

(a) **Offense defined.**—Any person who unintentionally causes the death of *another person* as the result of a

---

**1.** Appellant was also charged with two counts of aggravated assault by motor vehicle while driving under the influence, 75 Pa.C.S. § 3735.1; two counts of driving under the influence of alcohol, 75 Pa.C.S. § 3731(a)(4); one count of failing to stop at a stop sign, 75 Pa.C.S. § 3323(b); and one count of giving a false report, 75 Pa.C.S. § 3748.

**2.** The Commonwealth did not pursue its challenge to the dismissal of the homicide by vehicle count. *Id.* at 1188 n. 4.

violation of section 3731 (relating to driving while under the influence of alcohol or controlled substance) and who is convicted of violating section 3731 is guilty of a felony of the second degree. . . .

75 Pa.C.S. § 3735(a) (emphasis added). The majority acknowledged that, because Section 3735(a) is a penal statute, it was to be construed strictly, *see* 1 Pa.C.S. § 1928(b)(1),[3] but explained that the principle of strict construction did not require the narrowest possible interpretation or permit an interpretation that disregarded evident legislative intent. *See Commonwealth v. Highhawk,* 455 Pa.Super. 186, 687 A.2d 1123, 1126 (1996). The majority noted further that, as Section 3735 does not define the term "person," its use of the term was subject to the definition contained in Section 102 of the Motor Vehicle Code, which shall apply "unless the context clearly indicates otherwise." 75 Pa.C.S. § 102. Section 102 defines "person" as "[a] *natural person,* firm, copartnership, association or corporation." *Id.* (emphasis added).

Turning to the Commonwealth's assertion that a viable fetus is "a natural person" within the meaning of Section 102, the Superior Court majority acknowledged that, in criminal matters, the Commonwealth recognizes the longstanding "born alive" rule, which it defined as "the common law principle that only human beings 'born alive' are independent persons within the meaning of the law." *Id.* at 1189 n. 5. The majority determined, however, that in light of this Court's decision in *Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985), the Commonwealth's recognition of the "born alive" rule should cease. In *Amadio,* this Court had held that the estate of a stillborn child may institute a wrongful death and survival action for fatal injuries suffered while *en ventre sa mere* (that is, in the mother's womb). *See id.* at 208, 501 A.2d at 1089. Among the reasons for its decision, the Court had cited the significance, for problems of proof, of modern advances in medical knowledge. *See id.* at 203, 501 A.2d at 1086. Conclud-

---

3. Section 3735 is a penal statute because it imposes sanctions for violation of its provisions. *See Commonwealth v. Hill,* 481 Pa. 37, 43 n. 6, 391 A.2d 1303, 1306 n. 6 (1978).

ing that the progress of medical science was as relevant in the criminal as in the civil context, and that "it [was] time for the courts of this Commonwealth to react to advances in medical science rather than ignore such progress," *Booth*, 729 A.2d at 1190, the Superior Court majority held that "[v]iable fetuses not yet born alive are 'persons' within the meaning of the criminal laws of general application in this Commonwealth." *Id.* at 1190. The majority emphasized that its decision would not contravene or otherwise affect the Crimes Against the Unborn Child Act, 18 Pa.C.S. §§ 2601–2609, which created new criminal offenses, the victims of which are unborn children, or the Abortion Control Act, 18 Pa.C.S. §§ 3201–3220; rather, the decision would apply "only in cases where the criminal laws protect 'persons' in the most general terms." [4] *Id.* at 1190.

The dissent faulted the majority for failing to appreciate the significance of recent legislative pronouncements on the subject, including the Crimes Against the Unborn Child Act, *see Booth*, 729 A.2d at 1190 (Del Sole, J., dissenting), emphasizing that homicide by vehicle, DUI-related or otherwise, is not among the new offenses that the statute creates. More generally, the dissent expressed concern that the majority had impermissibly extended the criminal law on a common law basis. *See id.* at 1191. We granted allowance of appeal in light of the public importance of the matter at issue.

Such public importance requires that, at the outset, we make clear the nature, and the consequent limitations, of our review. As the Supreme Court of Illinois observed, in a decision addressing substantially the same issue, "[t]he extent to which the unborn child is to be accorded the legal status of one already born is one of the most debated questions of our time...." *People v. Greer*, 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203, 208 (1980). Two decades later, the debate continues. Weighing the substantive merits of the various positions

---

4. The Abortion Control Act defines the term "unborn child" as "an individual organism of the species homo sapiens from fertilization until live birth," 18 Pa.C.S. § 3203, and the Crimes Against the Unborn Child Act adopts this definition, *see* 18 Pa.C.S. § 2602. *See generally infra.*

in that debate is no part of our role in this matter. Rather, our role is to ensure that the issue before us is resolved in accordance with the settled principles that guide the criminal jurisprudence of this Commonwealth.

Our analysis begins with the fundamental acknowledgment that Section 3735 defines a crime under the laws of Pennsylvania. *See supra* note 3. Prior to the enactment of Title 18 (the Crimes Code) in 1972, the Commonwealth's criminal law was "a conglomeration of statutory law and common law-the latter filling the void in those areas where the former [was] silent." Sheldon S. Toll, *Pennsylvania's New Crimes Code—The Commonwealth's First New Criminal Code in More Than a Century,* PA. B.A.Q. 294, 296 (Mar.1973) (hereinafter Toll, *Pennsylvania's New Crimes Code* ). The Penal Code of 1939, for example, provided that "[e]very offense now punishable either by the statute or common law of this Commonwealth *and not specifically provided for by this act,* shall continue to be an offense punishable as heretofore." 18 P.S. § 5101 (repealed) (emphasis added; footnote omitted). The common law "[could] be used to establish the offense itself or to define the scope of imprecise statutory drafting." Toll, *Pennsylvania's New Crimes Code,* PA. B.A.Q. at 296. *See, e.g., Commonwealth v. Redline,* 391 Pa. 486, 492, 137 A.2d 472, 474 (1958) (observing that "[t]he definition of murder at English common law . . . alone defines the crime in this State").

■ Since the adoption of the Crimes Code, however, no conduct constitutes a crime in this Commonwealth unless it is a crime under Title 18 or another statute. *See* 18 Pa.C.S. § 107(b). Stated differently, Pennsylvania is a "code jurisdiction": it recognizes no common law crimes. *See id.; see also Commonwealth v. Bellis,* 497 Pa. 323, 328 n. 6, 440 A.2d 1179, 1181 n. 6 (Pa.1981); *Booth,* 729 A.2d at 1191 (Del Sole, J., dissenting); Toll, *Pennsylvania's New Crimes Code,* PA. B.A.Q. at 296–97. Necessarily, then, when the judiciary is required to resolve an issue concerning the elements of a criminal offense, its task is fundamentally one of statutory interpretation, and its overriding purpose must be to ascertain and effectuate the legislative intent underlying the statute.

*See* 1 Pa.C.S. § 1921(a); *Commonwealth v. Fisher,* 485 Pa. 8, 12, 400 A.2d 1284, 1287 (1979).

Moreover, penal statutes are to be strictly construed. *See* 1 Pa.C.S. § 1928(b)(1); *Commonwealth v. Wooten,* 519 Pa. 45, 53, 545 A.2d 876, 879 (1988); *Hill,* 481 Pa. at 43 n. 6, 391 A.2d at 1306 n. 6.[5] The need for strict construction does not require that the words of a penal statute be given their narrowest possible meaning or that legislative intent be disregarded, *see Wooten,* 519 Pa. at 53, 545 A.2d at 880; *Commonwealth v. Gordon,* 511 Pa. 481, 487, 515 A.2d 558, 561 (1986); *Commonwealth v. Duncan,* 456 Pa. 495, 497, 321 A.2d 917, 919 (1974), nor does it override the more general principle that the words of a statute must be construed according to their common and approved usage, *see* 1 Pa.C.S. § 1903(a); *Hill,* 481 Pa. at 43 n. 6, 391 A.2d at 1306 n. 6. It does mean, however, that where ambiguity exists in the language of a penal statute, such language should be interpreted in the light most favorable to the accused. *See Wooten,* 519 Pa. at 53, 545 A.2d at 879. More specifically, where doubt exists concerning the proper scope of a penal statute, it is the accused who should receive the benefit of such doubt. *See Commonwealth v. Allsup,* 481 Pa. 313, 317, 392 A.2d 1309, 1311 (1978); *see also Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) (observing that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"). Significantly, a court may not achieve an acceptable construction of a penal statute by reading into the statute terms that broaden its scope. *See Fisher,* 485 Pa. at 13, 400 A.2d at 1287.

5. We note that penal statutes falling within the Crimes Code are expressly subject to "constru[ction] according to the fair import of their terms...." 18 Pa.C.S. § 105. The "fair import" approach is appropriate, the Official Comment to Section 105 explains, "for a modern penal code which carefully defines crimes and defenses rather than leaving their definition to several centuries of common law." 18 Pa.C.S. § 105 Official Comment. Because the fair import provision applies only to the criminal offenses defined in Title 18, it is not directly at issue here. *See Commonwealth v. Lurie,* 524 Pa. 56, 63, 569 A.2d 329, 333 (1990). *See generally Commonwealth v. Besch,* 544 Pa. 1, 12 n. 7, 674 A.2d 655, 660 n. 7 (1996).

■   Early in its opinion, the Superior Court majority acknowledged that its resolution of the matter at issue was to be guided by the principles of interpretation generally applied to criminal statutes.  The court's consideration of those principles was minimal, however;  the determining factor in its resolution of the issue before it was the perceived desirability of extending the rationale of *Amadio* from the civil to the criminal law.  In the court's view, "the time had come" for the criminal justice system to expand its interpretation of the term "person" to encompass unborn children.  We are unable to accept this reasoning, since determining whether the General Assembly intended for the term "person" as used in Section 3735 to include a fetus should have been, but was not, the lodestar of the Superior Court's analysis.

The precise issue before the *Amadio* Court was whether there exists a right of recovery under the Wrongful Death Act, 42 Pa.C.S. § 8301, and the Survival Statute, 42 Pa.C.S. § 8302, on behalf of a child who was stillborn as a result of injuries sustained *en ventre sa mere.  See id.* at 201, 501 A.2d at 1085. Those statutes, as the Court noted, are remedial in nature and purpose and therefore should be liberally construed to accomplish their objectives.  *See id.* at 205, 501 A.2d at 1087.  *See generally* 1 Pa.C.S. § 1928(c);  *Centolanza v. Lehigh Valley Dairies, Inc.,* 540 Pa. 398, 406, 658 A.2d 336, 340 (1995). Previous decisions limiting the right to bring wrongful death and survival actions to those children born alive—*Scott v. Kopp,* 494 Pa. 487, 431 A.2d 959 (1981);  *Marko v. Philadelphia Transp. Co.,* 420 Pa. 124, 216 A.2d 502 (1966);  and *Carroll v. Skloff,* 415 Pa. 47, 202 A.2d 9 (1964)-gave those statutes an inappropriately narrow reading, the Court explained.  *See id.* at 205, 501 A.2d at 1087–88.

Moreover, the Court reasoned, the decisions just cited were inconsistent with the principle, recognized by the Court in *Sinkler v. Kneale,* 401 Pa. 267, 164 A.2d 93 (1960), "that a child *en ventre sa mere* is a separate individual from the moment of conception, and [may] sue for injuries received during gestation when the child is born alive," *Amadio,* 509 Pa. at 204, 501 A.2d at 1087, and with the body of medical

knowledge underlying such principle, *see id.*[6] If a child *en ventre sa mere* is an individual with the right to be free of prenatal injury, then, the Court continued, the child is also an individual when such injury causes its death, regardless of whether death occurs just before or just after birth. *See id.* at 204, 501 A.2d at 1087. Accordingly, this Court overruled the holdings of *Scott, Marko,* and *Carroll,* and extended to the estate and heirs of a stillborn child the right to institute survival and wrongful death actions, respectively, for fatal injuries suffered before birth. *See id.* at 208, 501 A.2d at 1089.

The significance of the controlling statutes, and the importance of achieving a correct interpretation of those statutes, received still greater emphasis in the concurring opinion of Mr. Justice Zappala. *See Amadio,* 509 Pa. at 208, 501 A.2d at 1089 (Zappala, J., concurring). The Survival Act, Justice Zappala observed, did not create a new cause of action; rather, it abrogated the common law rule that an action abates on the death of a party. *See id.* at 215, 501 A.2d at 1093. Accordingly, where the potential plaintiff was a fetus, the fundamental question was whether there existed on behalf of the fetus a cause of action that would survive the plaintiff's death. *See id.* According to Justice Zappala, the focus of this Court's reasoning in *Sinkler* was not the fact that the infant plaintiff was born alive, but "the separate identities of the mother and child, and the concomitant possibility of separate and distinct injuries and damages." *See id.* at 216, 501 A.2d at 1093. Justice Zappala cited, as a fundamental principle of tort law, that a cause of action accrues to an individual upon the occurrence of an injury causing damages; where such individual is a fetus, recovery of damages should not depend upon a "condition subsequent," that is, whether the fetus is born alive. *See id.* at 220–21, 501 A.2d at 1096.

6. In *Sinkler,* one of the plaintiffs was an infant born with Down's syndrome, allegedly as the result of an automobile accident when the infant's mother was approximately one month pregnant with the infant. *See id.* at 268, 164 A.2d at 93.

Turning to the Wrongful Death Act, Justice Zappala explained that the purpose of wrongful death statutes in this and other jurisdictions was to reverse the apparent common law rule that recovery could not be had for a tortious wrong resulting in death. *See id.* at 228, 501 A.2d at 1100. In Justice Zappala's view, this legislative objective would be frustrated if, having already held in *Sinkler* that a child in the womb may be the victim of a legally cognizable injury, this Court were to hold that the Wrongful Death Act does not apply where a child who has sustained prenatal injury is stillborn. *See id.* He perceived further support for such conclusion in the settled principle that "the cause of action contemplated by the statute is the tort which produces death and not the death caused by the tort." *Id.* at 229, 501 A.2d at 1100 (quoting *Centofanti v. Pennsylvania R.R. Co.*, 244 Pa. 255, 262, 90 A. 558, 561 (1914)). Emphasizing that "the statute is not of a class to be strictly construed but rather is remedial, to be 'liberally construed to effect [its] objects and to promote justice,' 1 Pa.C.S. § 1928," *id.* at 230, 501 A.2d at 1100–01, Justice Zappala concluded that a wrongful death action on behalf of a stillborn child should be allowed under the statute. *See id.* at 230, 501 A.2d at 1101.

In sum, *Amadio* is preeminently a tort decision. *See Amadio*, 509 Pa. at 208, 501 A.2d at 1089 (declining "to decide the criminal liability, if any, attendant upon causing the death of a child *en ventre sa mere*"). In that context, advances in medical knowledge were relevant because they served to identify the fetus as a separate individual and therefore, within the context of tort jurisprudence, as potentially a separate victim of negligence. The focus of the *Amadio* Court's analysis, however, was not on the state of medical progress *per se*, but on the controlling statutes, the remedial nature of the same, and the consequent desirability of affording recovery, via the liberal construction of those statutes, to previously unacknowledged victims of tortious injury. Those factors, which favored the abolition of the born alive rule in

civil cases, are, for the most part, absent in the criminal context.[7]

■ The Commonwealth contends, however, that the strictures inherent in the interpretation of a criminal statute may be avoided by treating the "born alive" rule as a common law rule of evidence rather than an element of a criminal offense, thereby rendering the rule subject to judicial modification or repeal. As an analogue, the Commonwealth cites this Court's abolition of the "year-and-a-day" rule that precluded a prosecution for murder if the victim did not die within a year and a

7. Notably, various other jurisdictions that have considered this issue have recognized that "the analogy between civil liability for tort and criminal liability for causing death is inapt." *Vo v. Superior Court of Maricopa County,* 172 Ariz. 195, 836 P.2d 408, 412 (Ct.App.1992) (quoting *Summerfield v. Superior Court,* 144 Ariz. 467, 698 P.2d 712, 719 (1985)). In declining to extend the abolition of the born alive rule from the civil to the criminal context, courts of other jurisdictions have emphasized the different objectives of these areas of the law, *see State v. Anonymous,* 40 Conn.Supp. 498, 516 A.2d 156, 159–60 (1986); *Greer,* 37 Ill.Dec. 313, 402 N.E.2d at 209; the necessity for strict construction of criminal statutes, *see Billingsley v. State,* 183 Ga.App. 850, 360 S.E.2d 451, 452 (1987); *State v. Trudell,* 243 Kan. 29, 755 P.2d 511, 515 (1988); *State v. Dickinson,* 28 Ohio St.2d 65, 275 N.E.2d 599, 602 (1971); *State v. Amaro,* 448 A.2d 1257, 1258 (R.I.1982); and deference to the legislature as sole creator of criminal offenses, *Hollis v. Commonwealth,* 652 S.W.2d 61, 63–64 (Ky.1983); *State v. Gyles,* 313 So.2d 799, 801 (La.1975); *People v. Guthrie,* 97 Mich.App. 226, 293 N.W.2d 775, 778 (1980), *appeal denied,* 417 Mich. 1006, 334 N.W.2d 616 (1983); *State v. Soto,* 378 N.W.2d 625, 630 (Minn.1985); *State ex rel. Atkinson v. Wilson,* 175 W.Va. 352, 332 S.E.2d 807, 810 (1985). *But see Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324, 1325 (1984) (noting similarities between civil and criminal cases); *Hughes v. State,* 868 P.2d 730, 734 (Okla.Crim.App.1994); *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703, 704 (1984). *See generally* Clarke D. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms,* 21 VAL. U.L.REV. 563, 598 (1987) (hereinafter "Forsythe, *Homicide of the Unborn Child* "); William E. Buelow III, Comment, *To Be and Not to Be: Inconsistencies in the Law Regarding the Legal Status of the Unborn Fetus,* 71 TEMP. L.REV. 963 (Winter 1998) (hereinafter "Buelow, *To Be and Not to Be* "); Agota Peterfy, Commentary, *Fetal Viability as a Threshold to Personhood,* 16 J. LEGAL MED. 607 (1995) (hereinafter "Peterfy, *Fetal Viability* "); Alan S. Wasserstrom, Annotation, *Homicide Based on Killing of Unborn Child,* 64 A.L.R. 5th 671 (2000).

In response to judicial decisions declining to abolish the born alive rule, the legislatures in a number of jurisdictions, including California, Louisiana, Illinois, Minnesota, and Rhode Island, have enacted statutes that abolish the rule or criminalize offenses against the unborn child. *See Vo,* 836 P.2d at 416 n. 8 (citing statutes); *Trudell,* 755 P.2d at 516–17 (same).

day of receiving the fatal blow. *See Commonwealth v. Ladd,* 402 Pa. 164, 166 A.2d 501 (1960). The Commonwealth's argument requires that we examine more closely both the born alive rule and the *Ladd* decision.

Preliminarily, we note that, prior to legislative activity in this area in recent decades, acceptance of the "born alive" rule was almost universal. *See Keeler v. Superior Court of Amador County,* 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617, 621 (1970) (observing that, by 1850, the rule "had long been accepted in the United States"); *Gyles,* 313 So.2d at 801 (stating that "[t]he uniform authority in all American jurisdictions is to this effect"); *Guthrie,* 293 N.W.2d at 776 n. 1 (quoting the trial court opinion for the proposition that "[n]o appellate court of the United States or England has ever, as a matter of common law definition, treated a fetus as a person for the purposes of criminal law"); *Soto,* 378 N.W.2d at 629 (describing the rule as "well-established in the great majority of jurisdictions"); *State v. Beale,* 324 N.C. 87, 376 S.E.2d 1, 3 (1989) (asserting that "the overwhelming majority of courts which have considered the issue [have] concluded that the killing of a viable but unborn child is not murder under the common law"). Pennsylvania recognized the born alive rule in *Commonwealth v. McKee,* 1 Add. 1 (Pa.1791), when this Court held that a woman could not be convicted of concealing the death of a bastard child absent "probable presumptive proof that the child was born alive." *Id.* at 2.[8]

8. *McKee* was apparently the earliest reported American decision to address the rule. *See* Forsythe, *Homicide of the Unborn Child,* 21 Val U.L.Rev at 598. *See also Commonwealth v. Drum,* 58 Pa. 9, 15 (1868) (stating the common law definition of murder as, in pertinent part, "when a person of sound memory and discretion unlawfully kills any reasonable creature in being"); *Commonwealth v. Riley,* 88 Pa. D. & C. 572 (Montg.Co.1953) (acknowledging that the crime of concealing the death of a bastard child "cannot be committed unless a child is born")(quoting 2 Trickett, Pennsylvania Criminal Law 588 (1908)); *Commonwealth v. O'Donohue,* 8 Phila. 623, 623 (1871) (reasoning that the defendant was not guilty of the murder of her newborn child, as there was no evidence that the child "had been born into the world alive, or in other words, had a legal existence"). *See generally Commonwealth v. Brown,* 6 Pa. D. & C.3d 627 (Phila.Co.1978) (reviewing the history of the born alive rule in Pennsylvania); Cari L. Leventhal, Comment, *The*

In its simplest statement, the "born alive rule" prescribes that only one who has been born alive can be the victim of homicide.[9] Causing the death of a fetus, whether viable or not, was not considered homicide at common law.[10] If, however, the fetus was born and then died of injuries inflicted prior to birth, a prosecution for homicide could be maintained.[11] Requirements for proof of live birth were, moreover, stringent: "the fetus must have been totally expelled from the mother and have shown clear signs of independent vitality." *Amaro*, 448 A.2d at 1259; *see also Hollis*, 652 S.W.2d at 62 (acknowledging that the prosecution had to prove affirmatively "not only that the child had breathed, because that might occur during birth, but that it had had a complete and seperate [sic] existence of its own after birth" (quoting *Jackson v. Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936))); *Morgan v. State*, 148 Tenn. 417, 256 S.W. 433 (1923) (discussing requirements of severed umbilical cord, independent circulation, and respiration). *See generally* Forsythe, *Homicide of*

Crimes Against the Unborn Child Act: Recognizing Potential Human Life in Pennsylvania Criminal Law, 103 Dick. L.Rev. 173 (Fall 1998).

9.  *See State v. Cotton*, 197 Ariz. 584, 5 P.3d 918, 921 (Ct.App.2000); *Keeler*, 87 Cal.Rptr. 481, 470 P.2d at 621; *Gyles*, 313 So.2d at 800; *Guthrie*, 293 N.W.2d at 776–77; *Soto*, 378 N.W.2d at 628; *State v. Willis*, 98 N.M. 771, 652 P.2d 1222, 1222 (Ct.App.1982); *Dickinson*, 275 N.E.2d at 601; *State v. Larsen*, 578 P.2d 1280, 1281 (Utah 1978).

10.  *See Meadows v. State*, 291 Ark. 105, 722 S.W.2d 584, 585 (1987); *Anonymous*, 516 A.2d at 158; *Billingsley*, 360 S.E.2d at 452; *Jones v. Commonwealth*, 830 S.W.2d 877, 880 (Ky.1992); *Beale*, 376 S.E.2d at 3; *State v. Evans*, 745 S.W.2d 880, 883 (Tenn.Crim.App.1987); *Atkinson*, 332 S.E.2d at 808.

11.  In the often-quoted words of Sir Edward Coke,

If a woman be quick with childe, and by a potion or otherwise killeth it in her womb, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, this is a great misprision [misdemeanor], and not murder; but if the childe be born alive and dyeth of the potion, battery, or other cause, this is murder; for in law it is accounted a reasonable creature, in rerum natura, when it is born alive.

3 Edward Coke, Institutes 58 (1648), *quoted in Cotton*, 5 P.3d at 921 n. 2; *Keeler*, 87 Cal.Rptr. 481, 470 P.2d at 626; *Dickinson*, 275 N.E.2d at 601; *see also Abrams v. Foshee*, 3 Iowa 274, 1856 WL 201 (Iowa 1856); *State v. Trudell*, 243 Kan. 29, 755 P.2d 511 (1988); *Cuellar v. State*, 957 S.W.2d 134 (Tex.Ct.App.1997).

*the Unborn Child,* 21 VAL. U.L.REV. at 595–605; Buelow, *To Be and Not to Be,* 71 TEMP. L.REV. at 972–74; Stephanie Ritrivi McCavitt, Note, *The "Born Alive" Rule: A Proposed Change to the New York Law Based on Modern Medical Technology,* 36 N.Y.L. SCH. L.REV. 609 (1991).

At least two reasons, both deriving from the state of medical knowledge in centuries past, may be discerned for such requirements. First, owing to the high incidence of prenatal mortality and stillbirths, it was exceedingly difficult to determine that a fetal death or stillbirth had resulted from a defendant's act and not from natural causes.[12] Second, because the fetus was considered to be dependent upon, and therefore essentially a part of, its mother, a prosecution for homicide could not be maintained unless it could be shown that the fetus had become a person separate from its mother.[13]

The vast strides in fetal medicine and neonatology that have occurred in recent decades have necessarily called into question the continuing viability of the born alive rule. Today it is understood that a mother and her unborn child are separate and distinct entities, *see Sinkler,* 401 Pa. at 273, 164 A.2d at 96, and that "medicine is generally able to prove the corpus delicti of the homicide of an unborn child," Forsythe, *Homicide of the Unborn Child,* 21 VAL. U.L.REV. at 579. In light of these developments, the born alive rule has been criticized in both the decisional law and the legal commentary as "an archaic legal fiction which no longer serves a legitimate objective." *Guthrie,* 293 N.W.2d at 778; *see also Cass,* 467 N.E.2d at 1328–29 (stating that "the antiquity of a rule is no measure

12. *See Vo,* 836 P.2d at 413; *Greer,* 37 Ill.Dec. 313, 402 N.E.2d at 207; *Trudell,* 755 P.2d at 513; *Cass,* 467 N.E.2d at 1328; *State v. Holcomb,* 956 S.W.2d 286, 291 (Mo.Ct.App.1997).

13. *See Gyles,* 313 So.2d at 800–01; *Guthrie,* 293 N.W.2d at 777; *Soto,* 378 N.W.2d at 628; *Hughes,* 868 P.2d at 731 (quoting 1 O. WARREN, WARREN ON HOMICIDE § 55 (1938)); *Amaro,* 448 A.2d at 1259; *Morgan,* 256 S.W. at 434; *see also Farley v. Sartin,* 195 W.Va. 671, 466 S.E.2d 522, 527 (1995) (explaining that at common law there was no recovery for prenatal torts because "an unborn child was but a part of the mother, ... and an injury to it was but an injury to the mother" (quoting *Allaire v. St. Luke's Hosp.,* 184 Ill. 359, 56 N.E. 638, 641 (1900) (Boggs, J., dissenting))).

of its soundness," and noting that medical science is now capable of proving causation in cases of fetal death); *Hughes*, 868 P.2d at 732 (asserting that medical and scientific advances have eliminated the need for the rule); Forsythe, *Homicide of the Unborn Child*, 21 VAL. U.L.REV. at 567, 608 (describing the rule as an anachronistic rule of medical jurisprudence); Patricia King, *The Juridical Status of the Fetus: A Proposal for Legal Protection of the Unborn*, 77 MICH. L.REV. 1647, 1659–60 (Aug.1979) (describing medical advances that "have eroded the adequacy of the live birth criterion"); Peterfy, *Fetal Viability*, 16 J. LEGAL MED. at 627 (stating that medical and scientific advances have rendered the reasons for the rule obsolete).

Nevertheless, judicial recognition of the rule's limitations has not, in most cases, resulted in its judicial abolition.[14] Throughout the decisions declining to take such action, there runs a common thread of explanation: whether to abolish the born alive rule is, in the view of these courts, a decision for the legislature because abolition of the rule would entail a substantive change in the criminal law. Several courts have explicitly stated as much. Explaining its decision to leave the

14. On this point, the Commonwealth argues that we may abolish the born alive rule by judicial decision because courts in Massachusetts, Oklahoma, and South Carolina have done so. The decisions in question, however, are less templates to follow than exceptions that prove the rule, as each of those courts emphasized that it was empowered to play a significant role in the development of the common law. The Supreme Judicial Court of Massachusetts did so at some length, explicitly rejecting the notion that it was "unable to develop common law rules of criminal law because the Legislature has occupied the entire field." *Cass*, 467 N.E.2d at 1327. "While this may be true in code jurisdictions," the Court continued, "it is not true in this Commonwealth, where our criminal law is largely common law." *Id*. Similarly, the Oklahoma court declared that it had "the right and duty to develop the common law of Oklahoma to serve the evolving needs of our citizens," *Hughes*, 868 P.2d at 733, and the South Carolina court cited its role in "declaring the common law as it should be." *Horne*, 319 S.E.2d at 704. Pennsylvania is a code jurisdiction, however, and its understanding of the judiciary's role in the development of the criminal law is otherwise.

Moreover, each of these courts, unlike the Superior Court in the case *sub judice*, acknowledged the "fair warning" element of due process protections and, accordingly, declared that its decision was prospective only. *See Cass*, 467 N.E.2d at 1329–30; *Hughes*, 868 P.2d at 735–36; *Horne*, 319 S.E.2d at 704.

matter for the legislature, the Supreme Court of West Virginia noted that

> [w]e have on occasion altered common law rules in the criminal field, but in these cases the alteration was of a procedural nature and did not create a new class or category of crime. For example, ... [i]n *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979), we concluded that venue in a criminal case is not an element of the substantive criminal offense and, therefore, it may be proved by a preponderance of the evidence.

> There is a considerable difference between this Court making alterations in criminal procedure or practice rules, authorized under our constitutionally recognized rulemaking power, and creating a new crime.

*Atkinson,* 332 S.E.2d at 811 (footnote and additional citation omitted).[15] More often, the courts have implicitly acknowledged the substantive nature of the proposed change by declaring that the judiciary would exceed its powers if it were to create a new crime or expand the definition of an existing one.[16] Expressing this view, the Supreme Court of Kentucky has observed that,

> where criminal sanctions are supposed to flow from the [state's] Penal Code rather than evolving out of court decisions, it would be fundamental error to create a crime in the absence of a statute. . . .

> This Court cannot presume that the legislature intended to license us to expand the class of persons who could be treated as victims of criminal homicide as we should deem appropriate in our own discretion.

15. *See also State v. McCall,* 458 So.2d 875, 877 (Fla.Dist.Ct.App.1984); *Soto,* 378 N.W.2d at 630.

16. *Vo,* 836 P.2d at 415; *Meadows,* 722 S.W.2d at 586; *Keeler,* 87 Cal.Rptr. 481, 470 P.2d at 625; *Greer,* 37 Ill.Dec. 313, 402 N.E.2d at 209; *State v. Green,* 245 Kan. 398, 781 P.2d 678, 682 (1989), *cert. denied,* 511 U.S. 1090, 114 S.Ct. 1848, 128 L.Ed.2d 473 (1994); *Gyles,* 313 So.2d at 801–02; *Guthrie,* 293 N.W.2d at 780–81; *Willis,* 652 P.2d at 1223; *Beale,* 376 S.E.2d at 4; *Dickinson,* 275 N.E.2d at 601.

*Hollis,* 652 S.W.2d at 63.[17]   In sum, the prevailing view is that the born alive rule implicates a substantive aspect of criminal offenses.

Nothing in the decisional law of this Commonwealth, including this Court's decision in *Ladd,* suggests that Pennsylvania has taken a different approach.   The difficulty confronting the Court in *Ladd,* more than a decade before the enactment of the Crimes Code, was whether to classify the year-and-a-day rule "as being [a rule] of evidence, procedure, or pleading, on the one hand, or as being part of the definition of murder or as an essential element of it or as a matter of substance, on the other."   *Id.* at 169, 166 A.2d at 504.   Because Pennsylvania had no statutory definition of murder at that time, the Court turned to the decisional law, explaining that "we have taken the Blackstonian definition as our own."   *Id.* at 172, 166 A.2d at 505.   This definition was as follows:

> A felonious homicide (i.e. murder) occurs when a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the sovereign prepense or aforethought. . . .

*Id.* (quoting *Redline,* 391 Pa. at 493, 137 A.2d at 493 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *195)).   As this definition of murder contains no reference to the year-and-a-day rule, the Court concluded that "[t]he rule cannot . . . be said to be part of the definition of murder, either in Blackstone or in Pennsylvania."   *Ladd,* 402 Pa. at 172, 166 A.2d at 505.

The same is not true of the born alive rule, however, as may be inferred from this Court's decision in *Redline.*   The *Redline* Court, considering malice as an essential element of murder, noted that the Blackstonian definition of murder was substantially the same as that adopted in *Drum,* 58 Pa. at 15, and uniformly applied thereafter.   In *Drum,* as noted earlier, *see supra* note 8, murder had been defined as

17.   *But see Cass,* 467 N.E.2d at 1329 n. 6 (analogizing the born alive rule to the year-and-a-day rule); Forsythe, *Homicide of the Unborn Child,* 21 VAL. U.L.REV. at 564 (arguing, based on historical analysis, that at common law the born alive rule was "entirely an evidentiary standard").

when a person of sound memory and discretion unlawfully kills any reasonable creature in being and under the peace of the Commonwealth, with malice aforethought, expressed or implied.

*Id.* This Court observed in *Redline* that

[t]he proof requirements *necessary to establish a case of murder* ... are no different than they were at the time of *Commonwealth v. Drum* .... The "reasonable creature in being" specified in the common law definition of murder, as stated in the *Drum* case, was none other than the human being whose death at the hands of another is still necessary to constitute a homicide.

*Id.* at 493, 137 A.2d at 475 (emphasis added). Thus, that the victim was a "reasonable creature in being" (that is, a person who had been born and was alive) was understood to be an essential element, requiring proof beyond a reasonable doubt, of the crime of homicide, and, as such, was not open to judicial modification.

Having determined that the Superior Court's analysis does not support its conclusion, we may nevertheless affirm that conclusion if it is correct on any other ground. *See Petrovick v. Commonwealth, Dep't of Transp.*, 559 Pa. 614, 625, 741 A.2d 1264, 1269 (1999). The pertinent question in this regard is whether the General Assembly has indicated, directly or indirectly, that the born alive rule is no longer operative. According to the Commonwealth, the adoption of the Abortion Control Act, 18 Pa.C.S. §§ 3201–3220, answers the question in the affirmative.

Enacted in 1982, the Abortion Control Act reflects the General Assembly's stated intention to protect the life and health of the woman and the child subject to abortion. *See* 18 Pa.C.S. § 3202(a). To that end, the General Assembly directed as follows:

(c) **Construction.**—In every relevant civil or criminal proceeding in which it is possible to do so without violating the Federal Constitution, the common and statutory law of Pennsylvania shall be construed so as to extend to the

unborn the equal protection of the laws and to further the public policy of this commonwealth encouraging childbirth over abortion.

18 Pa.C.S. § 3202(c). Focusing on the opening phrase of this subsection, the Commonwealth asserts that the General Assembly's aim of extending the equal protection of the laws to unborn children was intended to encompass not only proceedings directly affected by the Abortion Control Act, but proceedings in all other areas of the law as well. Thus, according to the Commonwealth, Section 3202(c) requires that the term "person" in the statutory definition of homicide by vehicle be read to include unborn children.

To accept the Commonwealth's argument is to assume that the legislature may create-and, in this instance, has created-criminal offenses by implication. As previously discussed, however, the principles that guide the interpretation of criminal statutes in a code jurisdiction such as Pennsylvania do not permit such an assumption: where the scope of a penal statute is uncertain, such uncertainty redounds to the benefit of the accused rather than the Commonwealth.[18]

Moreover, the enactment in 1997 of the Crimes Against the Unborn Child Act, 18 Pa.C.S. §§ 2601–2609 (the "Unborn Child Act"), indicates that where the General Assembly intends to expand the scope of the criminal law to encompass unborn children, it does so explicitly.[19] The Unborn Child Act

**18.** Furthermore, when Section 3202 (entitled "Legislative intent") is read in its entirety, a more logical explanation for the cited language emerges. In Section 3202(b), the General Assembly noted certain factual findings that caused it concern, including the steady reduction in the age of fetal viability, the significant number of late-term abortions that result in live births or could do so if appropriate measures were taken, and the need to hold physicians "to precise standards of care in cases where their actions do or may result in the death of an unborn child." 18 Pa.C.S. § 3202(b). As the reference to equal protection in Section 3203(c) directly follows this statement of abortion-related concerns, it seems likely that the "relevant" proceedings mentioned in Section 3202(c) are those that implicate such concerns. It seems far less likely that the legislature contemplated a prosecution pursuant to the homicide by vehicle/DUI statute in the Vehicle Code as a proceeding relevant to the Abortion Control Act.

**19.** The Unborn Child Act was adopted on October 2, 1997, three months after Appellant committed the offenses at issue, and was made

created five specific crimes involving violence directed against unborn children: first-, second-, and third-degree murder; voluntary manslaughter; and aggravated assault. *See* 18 Pa.C.S. §§ 2603–2606. At the same time, the legislature amended the sections of the Crimes Code addressing territorial applicability, classes of offenses, time limitations, and sentences for murder to reflect the existence of these newly created offenses. *See* 18 Pa.C.S. §§ 102, 106, 108, 1102. To define "unborn child," as noted earlier, the legislature adopted the definition set forth in the Abortion Control Act, namely, "an individual organism of the species homo sapiens from fertilization until live birth." *See supra* note 4.

Enactment of this legislation supports the conclusion that, prior thereto, an unborn child could not have been the victim of such offenses; were it otherwise, the legislation would have been unnecessary.[20] Such enactment also provides further support for, and indicates the legislature's understanding of, the fundamental principle that decisions concerning whether to criminalize certain conduct, or to expand the category of those who may be victims of certain conduct, are within the purview of the legislature, not the judiciary.

Accordingly, the order of the Superior Court is reversed, and the trial court's order is reinstated.

---

effective 180 days after enactment. We do not undertake here to determine the scope of the offenses which it defines.

**20.** Although supporters and opponents of the proposed legislation debated its wisdom, legislators on both sides of the debate appeared to agree that the then-current state of the law did not authorize the prosecution of offenses against unborn children. *See* Legis. J.—House at 871–81 (April 29, 1997).