**[J-111-2020] [OAJC: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 8 WAP 2020 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered November |
| | : | 19, 2019 at No. 1281 WDA 2018 |
| v. | : | affirming in part and reversing in |
| | : | part the Judgment of Sentence of |
| | : | the Court of Common Pleas of |
| WAYLYNN MARIE HOWARD, | : | Allegheny County entered August 1, |
| | : | 2018 at No. CP-02-CR-0008615- |
| Appellant | : | 2017. |
| | : | |
| | : | ARGUED: December 2, 2020 |

**CONCURRING OPINION**

**JUSTICE WECHT**

Waylynn Marie Howard asks this Court to determine whether the Commonwealth proved beyond a reasonable doubt that she "knowingly endanger[ed] the welfare of [her] child by violating a duty of care, protection, or support." 18 Pa.C.S. § 4304(a)(1). I agree with the Opinion Announcing the Judgment of the Court ("OAJC") that Howard's "act of allowing [her child] to ride in a car-for-hire without a car seat was, without more, insufficient to support a conviction for endangering the welfare of a child."[1] I further agree that, because the statutory phrase "endangers the welfare" refers to a result "of the actor's conduct," a verdict of guilt requires that the accused "be 'aware that it is practically certain that'" her conduct "creates a dangerous situation."[2]

---

[1]   OAJC at 20.

[2]   *Id.* at 15 (quoting 18 Pa.C.S. § 302(b)(2)(i)).

Respectfully, I cannot endorse the OAJC's choice to invoke "the common sense of the community" and the "sense of decency, propriety, and morality which most people entertain" in reversing Howard's conviction.[3]  I stress that the OAJC cannot be faulted for reciting this windy language, which it did not invent.  But I believe we should no longer perpetuate such cant.  Slogans like these are unfortunate vestiges of this Court's jurisprudential past and should be abandoned.  They invite lawyers to seek, and judges to make, policy and morality pontifications defining criminality in circumstances where the General Assembly already has exercised its sole prerogative to prescribe the offense by statute.  Amorphous standards that call upon judges to interpret statutes by divining and then applying the "sense of decency, propriety, and morality which most people entertain" or by mystically conjuring "the common sense of the community" cannot be applied in any principled way.

What's more, none of this judicial moralizing is necessary to the OAJC's otherwise fine analysis.  Our familiar tools of statutory interpretation are sufficient to show that Howard's conduct did not satisfy the statutory elements of endangering the welfare of a child.  Unlike the OAJC, I would not permit hoary notions about some "common sense of the community" or some mantra about a "sense of decency, propriety, and morality which most people entertain" to continue stumbling and bumbling forward in Pennsylvania law.

In *Commonwealth v. Mack*, 359 A.2d 770 (Pa. 1976), this Court first staked a claim to the "common sense of the community" standard for purposes of identifying the conduct that Section 4304 proscribes.  There, this Court examined an argument that Section 4304 was unconstitutionally vague.  *Id.* at 771.  In holding that the statute was not void for vagueness, the *Mack* Court opined that Section 4304 is a "juvenile statute," which "is basically protective in nature."  *Id.* at 772 (quoting *Commonwealth v. Marlin*, 305 A.2d 14,

---

[3]     *Id.* at 15-16 (quoting *Commonwealth v. Lynn*, 114 A.3d 796, 818 (Pa. 2015)).

18 (Pa. 1973)). Statutes aimed at safeguarding "the welfare and security of our children," according to *Mack*, "are to be given meaning by reference to the 'common sense of the community' and the broad protective purposes for which they are enacted." *Id.* (quoting *Marlin*, 305 A.2d at 18). Therefore, the Court opined:

> With these two factors in mind, we believe that [S]ection 4304 is not facially vague. Phrases such as 'endangers the welfare of the child' and 'duty of care, protection or support' are not esoteric. Rather, they are easily understood and given content by the community at large. An individual who contemplates a particular course of conduct will have little difficulty deciding whether his intended act 'endangers the welfare of the child' by his violation of a 'duty of care, protection or support.'

*Id.* Employing the "common sense of the community" standard, *Mack* held that Section 4304 was not unconstitutionally vague, as that standard (supposedly) provided some "ascertainable standard of conduct." *See id.*

While *Mack* first interpreted Section 4304 using the "the common sense of the community" and "sense of decency propriety and morality which most people entertain" criteria, *Marlin* was the first instance in which this Court interpreted a criminal offense— namely, corrupting the morals of a minor by contributing to delinquency—under that standard. *See Marlin*, 305 A.2d at 18; 11 P.S. § 262 (repealed 1972). Like a Matryoshka doll, *Marlin* itself had pulled this grand language from a 1957 Superior Court case, *Commonwealth v. Randall*, 133 A.2d 276 (Pa. Super. 1957), which concerned the offense of corrupting the morals of a minor. *See* 18 P.S. § 4532 (repealed 1972). In *Randall*, the Superior Court offered the following shibboleth:

> The comprehensive words of the statute, 'whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years' certainly convey concrete impressions to the ordinary person. The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

*Randall*, 133 A.2d at 280. *Randall* sermonized further that "the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain" imbue statutes with clarity because:

> We are a religious people whose institutions presuppose a Supreme Being. Our Federal and State Constitutions assume that the moral code which is part of God's order in this world, exists as the substance of society. The people of this State have acted through their legislature on that assumption. We have not so cast ourselves adrift from that code nor are we so far gone in cynicism that the word 'immoral' has no meaning for us. Our duty, as a court, is to uphold and enforce the laws, not seek reasons for destroying them.

*Id.* (citations omitted). Judicial attempts to channel and then saturate our law with the commands of "a Supreme Being" may have had some place in the jurisprudence of a bygone era. *Id.* In 2021, such attempts smack of nothing so much as breathtaking sanctimony. Indeed, such rhetoric stands in flagrant dereliction of the judicial duty simply "to uphold and enforce the laws." *See id.*

The *Mack* Court employed "the common sense of the community" standard for the purpose of holding that Section 4304 was not unconstitutionally vague. Modernity notwithstanding, Pennsylvania courts continue to invoke this language in determining whether the circumstances of particular cases fall within Section 4304's reach.[4] Today's OAJC goes even a bit further, apparently elevating this "common sense of the community" language to a non-statutory element of Section 4304(a)(1). I cannot join in this approach.

The sloganeering of *Mack*, *Marlin*, and *Randall* recalls the bad old days of the common law of crimes, when courts took it upon themselves to decide whether certain

---

[4]     *See, e.g.*, *Lynn*, 114 A.3d at 826 (employing "the common sense of the community, and the sense of decency, propriety, and morality which most people entertain" to conclude that conduct was criminal under Section 4304(a)); *Commonwealth v. Retkofsky*, 860 A.2d 1098, 1099 (Pa. Super. 2004) ("Whether particular conduct falls within the purview of the statute is to be determined within the context of the 'common sense of the community.'") (quoting *Mack*, 359 A.2d at 772).

conduct should, as a matter of public policy, be declared criminal. *Cf. Commonwealth v. Miller*, 94 Pa. Super. 499, 507 (Pa. Super. 1928) (explaining that, at common law, conduct worthy of criminal punishment consisted of "acts which injuriously affect public morality, or obstruct, or pervert public justice, or the administration of government"). During that era, courts strived to somehow magically align the criminal law "with the moral code which is part of God's order in this world." *Randall*, 133 A.2d at 280. For many decades, this common law divination of oracular prophecy has been displaced by our Commonwealth's purely code-based approach to criminal law.[5]

Before 1972, "the Commonwealth's criminal law was a conglomeration of statutory law and common law—the latter filling the void in those areas where the former was silent." *Commonwealth v. Booth*, 766 A.2d 843, 845 (Pa. 2001) (cleaned up). However, by enacting Title 18, the General Assembly abolished common law crimes. 18 Pa.C.S. § 107(b).[6] "No conduct constitutes a crime unless it is a crime under [Title 18] or another statute of this Commonwealth." *Id.* In other words, criminal law, in the sense courts speak of it today, is positive law: it does not exist without some definite statutory authority behind it. *See id.* at 846 ("Since the adoption of the Crimes Code, however, no conduct constitutes a crime in this Commonwealth unless it is a crime under Title 18 or another statute."). In this criminal code jurisdiction, it is the legislature, not the judiciary, that prescribes the conduct that is subject to criminal punishment.

---

[5]  *See Commonwealth v. Irland*, 193 A.3d 370, 375 (Pa. 2018) (observing that, in 1972, "the Crimes Code abolished common law crimes").

[6]  Notably, *Marlin* and *Randall*—the decisions responsible for *Mack*'s "common sense of the community and sense of decency, propriety, and morality which most people entertain" language—both concerned now-repealed criminal statutes that the legislature enacted before 1972, when Pennsylvania criminal law was still a stew of statutory law mixed with common law. *See Marlin*, 305 A.2d at 15 (interpreting Act of June 2, 1933, P.L. 1433, § 20, 11 P.S. § 262 (repealed 1972)); *Randall*, 133 A.2d at 277 (addressing the constitutionality of Act of June 3, 1953, P.L. 277, § 1, 18 P.S. § 4532 (repealed 1972)).

It is not for Pennsylvania's judiciary to deem conduct worthy of criminalization based upon judges' hunches as to whether an act "injuriously affect[ed] public morality, or obstruct[ed], or pervert[ed] public justice, or the administration of government." *Miller*, 94 Pa. Super. at 507. No longer do we strain to conform statutory provisions to "the moral code which is part of God's order in this world." *Randall*, 133 A.2d at 280. Discerning the elements of a criminal offense is a task of statutory interpretation. Normative judgments and judicial assumptions about public morality play no role in the statutory inquiry. The OAJC errs in holding that, "in determining whether a parent or guardian's conduct is sufficient to support a conviction under Section 4304(a)(1), courts must consider whether the conduct at issue offends the 'common sense of the community' and the 'sense of decency, propriety and the morality which most people entertain.'" OAJC at 15-16 (quoting *Lynn*, 114 A.3d at 818).

In addition to calling for a determination beyond our prerogative, the OAJC invites a non-uniform application of Section 4304(a)(1). The OAJC instructs the Commonwealth to present evidence "regarding the community in which [the accused] live[s]." *Id.* at 17. Under this approach, the criminality of the accused's conduct will depend upon the particular locality in which the conduct occurred and upon the decision-maker's sense of that locality's norms. A pattern of conduct occurring somewhere in Eastern Pennsylvania could establish a Section 4304(a)(1) offense if that "community" is thought to deem it immoral, but an identical pattern of conduct arising somewhere in Western Pennsylvania might perhaps be insufficient to support a conviction if a judge thinks that locality deems it morally permissible. This is not law. It is chaos, followed by tyranny.[7] Such a perverse result undermines the precept that laws must apply uniformly. Otherwise, they are not

---

[7] *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring) ("If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny.")

laws; they are only diktat. A predictable and fair application of Section 4304(a)(1) is unattainable if criminal culpability sways upon the fickle tides of judicial divination of communal norms and sensibilities.

Nor can I imagine what evidence demonstrates adequately that a course of conduct violates any given community's moral standards. How many people in a community must agree on the propriety of a course of conduct in order to sustain a conviction under Section 4304(a)(1)? Will the Commonwealth be required to present testimony of those persons in order to demonstrate the community's norms? Perhaps we should take a poll? In defining the relevant community, should courts consider the moral beliefs of all those individuals within a defined spatial proximity to the accused, or should we limit the relevant community to those who share a common religion, gender, political affiliation, socioeconomic status, or ethnicity with the accused? Should the inquiry encompass the norms of the community in which the alleged offense occurred, or should it focus instead upon the ethos of the defendant's community? Will the Commonwealth have to procure a sociological study of the relevant community's habits and then present expert testimony to that effect? Will philosophers, religious leaders, and ethicists be qualified to render expert opinion on morality and virtue? Such questions and absurdities abound. We are now well beyond the realm of proper judicial considerations in interpreting the elements of a criminal offense defined by the legislature.

The enactments of the legislature alone define conduct as worthy of criminal sanction. "[W]hen the judiciary is required to resolve an issue concerning the elements of a criminal offense, its task is fundamentally one of statutory interpretation." *Booth*, 766 A.2d at 846. In fulfilling that task, we are limited to the rules of interpretation in the Statutory Construction Act. 1 Pa.C.S. §§ 1501-1991. The "common sense of the community" and "the sense of decency, propriety, and morality which most people

entertain" are not among the interpretive tools at our disposal. The proven tools of statutory construction sufficiently support the OAJC's conclusion that Howard's "act of allowing [her child] to ride in a car-for-hire without a car seat was, without more, insufficient to support a conviction for endangering the welfare of a child." OAJC at 20.

As the OAJC observes, this Court is required to interpret Section 4304(a)(1)'s ambiguous phrase "knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. 4304(a)(1). When, as here, the language of the statute is ambiguous, the Statutory Construction Act instructs courts to give effect to the intent of the General Assembly by considering several contextual considerations, including the occasion and necessity of the statute, the mischief to be remedied, and the object to be attained. *See* 1 Pa.C.S. § 1921(c). Because Section 4304 is derived from Section 230.4 of the Model Penal Code ("MPC"), precedent from other jurisdictions that have adopted Section 230.4 of the MPC is instructive. *See id.* § 1927 ("Statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."). Additionally, Section 4304's commentary is a useful aid in carrying out the intention of the drafters. *See id.* § 1939; *see also In re Tr. Under Agreement of Taylor*, 164 A.3d 1147, 1160 n.6 (Pa. 2017) (explaining that, when a statute is ambiguous, commentary is a helpful tool in ascertaining legislative intent).

In pertinent part, the comment to Section 4304 provides that "[t]he offense involves the endangering of the physical or moral welfare of a child by an act or omission in violation of legal duty even though such legal duty does not itself carry a criminal sanction." 18 Pa.C.S. 4304(a)(1), Jt. St. Govt. Comm. cmt.—1967. While the violation of the duty need not constitute a separate criminal offense, some definite legal duty must exist. The lower courts erred in concluding that Howard violated an established legal duty

under the Motor Vehicle Code in failing to place safety restraints on her child while riding in a car driven by a third party.

According to the trial court, Howard violated the "duty of care codified at 75 Pa.C.S. § 4581." Tr. Ct. Op., 11/26/2018, at 4. In relevant part, Section 4581 of the Motor Vehicle Code provides that "any person *who is operating* a passenger car . . . and who transports a child under four years of age anywhere in the motor vehicle . . . shall fasten such child securely in a child passenger restraint system." 75 Pa.C.S. § 4581(a)(1)(ii) (emphasis added). This section establishes a duty to fasten a child passenger in a restraint system— but that duty belongs to the operator of the vehicle. As the OAJC astutely observes, the legislature "has not enacted a corresponding statute imposing a similar duty on a non-driving parent or guardian." OAJC at 18. Howard was a passenger in the vehicle. She did not operate the car-for-hire at any point during the trip. The trial court held incorrectly that Howard violated a duty of care within the meaning of Section 4304 vis-à-vis her purported violation of Section 4581 of the Motor Vehicle Code.[8]

---

[8] The OAJC's observation that a violation of Section 4581 is inadmissible in a criminal prosecution provides further support for the contention that Section 4304 of the Crimes Code does not criminalize the conduct contemplated in Section 4581. *See* OAJC at 18 (citing 75 Pa.C.S. § 4581(f)). Like the OAJC, I cannot agree with Commonwealth's recklessly asserted contention that, because the car-for-hire did not have a car seat, Howard should have used a seatbelt to secure her child. *See id* at 3 n.5; Commonwealth's Brief at 10. The National Highway Safety Administration cautions against using a seatbelt on a child who is less than eight years old. OAJC at 3 n.5. Indeed, doing so increases the risk of injury to the child. MEDSCAPE, ADULT SEAT BELTS DON'T KEEP CHILDREN SAFE, https://www.medscape.com/viewarticle/411894 (June 8, 2000) ("nearly 40 percent of 2-to 5-year-old children are being placed in adult seat belts rather than car or booster seats, dramatically increasing their risk of injury in a crash). Specifically, failing to use an age-appropriate restraint system increases the likelihood of a child suffering head and brain injuries, which have a potential for long-term consequences. *Id.* Nor is there evidence to support the Commonwealth's claim that placing a seatbelt on a child is safer than no restraint system at all. Using a seat belt on a child under the age of eight creates a hazard of strangulation, even absent a collision, because the seatbelt is too large to fit on the child securely. *Id.*

Even if Howard was operating the vehicle, failing to place safety restraints on a child, without more, does not constitute the type of conduct proscribed by Section 4304. As the OAJC notes, Section 4304 criminalizes conduct that violates a legal duty and thus creates a "perilous or dangerous situation." *Id.* at 14. A dangerous situation requires a likely threat of harm to the child. Case law from other jurisdictions that have adopted Section 230.4 of the MPC supports that conclusion. In those jurisdictions, courts have interpreted the word "endanger" as requiring circumstances that present an "actual and significant" likelihood of harm to the child. *See In re N.K.*, 153 A.3d 198, 203 (N.H. 2016) (holding that, where New Hampshire's child endangerment statute failed to define "endangerment," the common usage of the term suggested that a child is endangered "when the risk of injury to his or her welfare is actual and significant—as opposed to speculative or a mere possibility"); *see also State v. Fisher*, 631 P.2d 239, 243 (Kan. 1981) (interpreting the statutory phrase "a situation that may endanger the child's life or health" as requiring "something more than a faint or remote possibility; it means that there is a reasonable probability, a likelihood that harm to the child will result"); *State ex rel. Juvenile Dept. of Deschutes Cty. v. Vanbuskirk*, 122 P.3d 116, 118 (Or. Ct. App. 2005) (explaining that, in deciding whether a condition or circumstances endanger the welfare of a child, the dispositive question "is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child").

Section 4304(a)(1) does not criminalize conduct that creates a mere theoretical possibility of harm; the threat of harm must be real and probable. One does not expect that most, or even a significant number of, car rides will result in a dangerous collision. Empirical data supports that common sense conclusion. The average American will be

involved in a motor vehicle collision approximately once every 17.9 years.[9]  Of the approximately 6.7 million car crashes reported in 2019, 4.8 million of those crashes (71%) resulted in property damage only.[10]  In 2019, per every 100,000 people in the United States, eleven people (**.**011%) died in a traffic collision and 835 people (**.**83%) suffered injuries.[11]  The possibility that a typical car ride will result in a collision, let alone a physically harmful one, is small.  The failure to secure a child with safety restraints during a routine car ride, in and of itself, does not create a substantial likelihood of harm.  Because "perilous or dangerous situation" refers to circumstances creating a likely risk of harm, the lone fact that Howard failed to fasten her child in a restraint system cannot support a conviction for endangering the welfare of a child under Section 4304.

In sum, while Section 4304 is distinct from other criminal offenses considering its broad and fluid protective purpose, that expansive aim does not exempt it from the precept that courts are prohibited from deeming conduct worthy of criminalization on some "community decency" ground.  Title 18 aims to provide clear and uniform standards for criminal offenses that do not vary based upon the moral stances of either the judges or the locality in which the accused committed the alleged offense.  When possible, courts achieve the requisite uniformity by using the tools of statutory interpretation to create a clear and definite construction of the provision at issue.  Those tools demonstrate that endangering the welfare of a child under Section 4304(a)(1) requires proof that the accused knowingly violated a legal duty and that, in doing so, the accused created a

---

[9]    Karen Aho, *Here's How Many Car Accidents You'll Have*, FOX BUSINESS, https://www.foxbusiness.com/features/heres-how-many-car-accidents-youll-have    (last updated Jan. 12, 2016).

[10]    U.S. DEP'T OF TRANSP., NAT'L HIGHWAY SAFETY ADMIN., TRAFFIC SAFETY FACTS ANNUAL REPORT (2020) https://cdan.dot.gov/tsftables/tsfar.htm#.

[11]    *Id.*

situation that she knew presented an actual and significant risk of harm to the child. Howard did not engage in conduct that met those requisites. The tools of statutory construction alone compel that conclusion. Ascertaining the meaning of Section 4304 does not entail an effort to supplicate the "brooding omnipresence in the sky"[12] incarnated in some inchoate community's sense of decency, propriety, and morality.

While I agree with the OAJC's conclusions regarding both the requisite *mens rea* and the sufficiency of the evidence, I cannot join the OAJC's application of the "common sense of the community" standard to arrive at those important holdings.

---

[12] *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting).